BROOKE GROUP LTD. *v.* BROWN &
WILLIAMSON TOBACCO CORP.

No. 92–466.   Argued March 29, 1993—Decided June 21, 1993

210

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE and BLACKMUN, JJ., joined, *post*, p. 243.

*Phillip Areeda* argued the cause for petitioner. With him on the briefs were *Charles Fried, Jean E. Sharpe, Josiah S. Murray III, James W. Dobbins, Garret G. Rasmussen,* and *C. Allen Foster.*

*Robert H. Bork* argued the cause for respondent. With him on the brief were *Griffin B. Bell, Frederick M. Rowe, Michael L. Robinson, Abbott B. Lipsky, Jr.,* and *Veronica G. Kayne.**

---

*Briefs of *amici curiae* urging affirmance were filed for Atlantic Richfield Co. by *Ronald C. Redcay, Matthew T. Heartney, Otis Pratt Pearsall, Philip H. Curtis, Francis X. McCormack, Donald A. Bright,* and *Edward E. Clark;* and for ITT Corp. by *John H. Schafer* and *Edwin A. Kilburn.*

Briefs of *amici curiae* were filed for the Business Roundtable by *Thomas B. Leary;* and for the Grocery Manufacturers of America, Inc., by *Terry Calvani, W. Todd Miller,* and *C. Douglas Floyd.*

JUSTICE KENNEDY delivered the opinion of the Court.

This case stems from a market struggle that erupted in the domestic cigarette industry in the mid-1980's. Petitioner Brooke Group Ltd., whom we, like the parties to the case, refer to as Liggett because of its former corporate name, charges that to counter its innovative development of generic cigarettes, respondent Brown & Williamson Tobacco Corporation introduced its own line of generic cigarettes in an unlawful effort to stifle price competition in the economy segment of the national cigarette market. Liggett contends that Brown & Williamson cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force Liggett to raise its own generic cigarette prices and introduce oligopoly pricing in the economy segment. We hold that Brown & Williamson is entitled to judgment as a matter of law.

## I

In 1980, Liggett pioneered the development of the economy segment of the national cigarette market by introducing a line of "black and white" generic cigarettes. The economy segment of the market, sometimes called the generic segment, is characterized by its bargain prices and comprises a variety of different products: black and whites, which are true generics sold in plain white packages with simple black lettering describing their contents; private label generics, which carry the trade dress of a specific purchaser, usually a retail chain; branded generics, which carry a brand name but which, like black and whites and private label generics, are sold at a deep discount and with little or no advertising; and "Value-25s," packages of 25 cigarettes that are sold to the consumer some 12.5% below the cost of a normal 20-cigarette pack. By 1984, when Brown & Williamson entered the generic segment and set in motion the series of events giving rise to this suit, Liggett's black and whites represented 97% of the generic segment, which in turn accounted for a little

more than 4% of domestic cigarette sales. Prior to Liggett's introduction of black and whites in 1980, sales of generic cigarettes amounted to less than 1% of the domestic cigarette market.

Because of the procedural posture of this case, we view the evidence in the light most favorable to Liggett. The parties are in basic agreement, however, regarding the central, historical facts. Cigarette manufacturing has long been one of America's most concentrated industries, see F. Scherer & D. Ross, Industrial Market Structure and Economic Performance 250 (3d ed. 1990) (hereinafter Scherer & Ross); App. 495–498, and for decades, production has been dominated by six firms: R. J. Reynolds, Philip Morris, American Brands, Lorillard, and the two litigants involved here, Liggett and Brown & Williamson. R. J. Reynolds and Philip Morris, the two industry leaders, enjoyed respective market shares of about 28% and 40% at the time of trial. Brown & Williamson ran a distant third, its market share never exceeding 12% at any time relevant to this dispute. Liggett's share of the market was even less, from a low of just over 2% in 1980 to a high of just over 5% in 1984.

The cigarette industry also has long been one of America's most profitable, in part because for many years there was no significant price competition among the rival firms. See Scherer & Ross 250–251; R. Tennant, American Cigarette Industry 86–87 (1950); App. 128, 500–509, 531. List prices for cigarettes increased in lockstep, twice a year, for a number of years, irrespective of the rate of inflation, changes in the costs of production, or shifts in consumer demand. Substantial evidence suggests that in recent decades, the industry reaped the benefits of prices above a competitive level, though not through unlawful conduct of the type that once characterized the industry. See Tennant, *supra*, at 275, 342; App. 389–392, 514–519, 658–659; cf. *American Tobacco Co.* v. *United States*, 328 U. S. 781 (1946); *United States*

v. *American Tobacco Co.*, 221 U. S. 106 (1911); Scherer & Ross 451.

By 1980, however, broad market trends were working against the industry. Overall demand for cigarettes in the United States was declining, and no immediate prospect of recovery existed. As industry volume shrank, all firms developed substantial excess capacity. This decline in demand, coupled with the effects of nonprice competition, had a severe negative impact on Liggett. Once a major force in the industry, with market shares in excess of 20%, Liggett's market share had declined by 1980 to a little over 2%. With this meager share of the market, Liggett was on the verge of going out of business.

At the urging of a distributor, Liggett took an unusual step to revive its prospects: It developed a line of black and white generic cigarettes. When introduced in 1980, black and whites were offered to consumers at a list price roughly 30% lower than the list price of full-priced, branded cigarettes. They were also promoted at the wholesale level by means of rebates that increased with the volume of cigarettes ordered. Black and white cigarettes thus represented a new marketing category. The category's principal competitive characteristic was low price. Liggett's black and whites were an immediate and considerable success, growing from a fraction of a percent of the market at their introduction to over 4% of the total cigarette market by early 1984.

As the market for Liggett's generic cigarettes expanded, the other cigarette companies found themselves unable to ignore the economy segment. In general, the growth of generics came at the expense of the other firms' profitable sales of branded cigarettes. Brown & Williamson was hardest hit, because many of Brown & Williamson's brands were favored by consumers who were sensitive to changes in cigarette prices. Although Brown & Williamson sold only 11.4% of the market's branded cigarettes, 20% of the converts to

Liggett's black and whites had switched from a Brown & Williamson brand. Losing volume and profits in its branded products, Brown & Williamson determined to enter the generic segment of the cigarette market. In July 1983, Brown & Williamson had begun selling Value-25s, and in the spring of 1984, it introduced its own black and white cigarette.

Brown & Williamson was neither the first nor the only cigarette company to recognize the threat posed by Liggett's black and whites and to respond in the economy segment. R. J. Reynolds had also introduced a Value-25 in 1983. And before Brown & Williamson introduced its own black and whites, R. J. Reynolds had repriced its "Doral" branded cigarette at generic levels. To compete with Liggett's black and whites, R. J. Reynolds dropped its list price on Doral about 30% and used volume rebates to wholesalers as an incentive to spur orders. Doral was the first competition at Liggett's price level.

Brown & Williamson's entry was an even graver threat to Liggett's dominance of the generic category. Unlike R. J. Reynolds' Doral, Brown & Williamson's product was also a black and white and so would be in direct competition with Liggett's product at the wholesale level and on the retail shelf. Because Liggett's and Brown & Williamson's black and whites were more or less fungible, wholesalers had little incentive to carry more than one line. And unlike R. J. Reynolds, Brown & Williamson not only matched Liggett's prices but beat them. At the retail level, the suggested list price of Brown & Williamson's black and whites was the same as Liggett's, but Brown & Williamson's volume discounts to wholesalers were larger. Brown & Williamson's rebate structure also encompassed a greater number of volume categories than Liggett's, with the highest categories carrying special rebates for orders of very substantial size. Brown & Williamson marketed its black and whites to Liggett's existing distributors as well as to its own full list of

buyers, which included a thousand wholesalers who had not yet carried any generic products.

Liggett responded to Brown & Williamson's introduction of black and whites in two ways. First, Liggett increased its own wholesale rebates. This precipitated a price war at the wholesale level, in which Liggett five times attempted to beat the rebates offered by Brown & Williamson. At the end of each round, Brown & Williamson maintained a real advantage over Liggett's prices. Although it is undisputed that Brown & Williamson's original net price for its black and whites was above its costs, Liggett contends that by the end of the rebate war, Brown & Williamson was selling its black and whites at a loss. This rebate war occurred before Brown & Williamson had sold a single black and white cigarette.

Liggett's second response was to file a lawsuit. Two weeks after Brown & Williamson announced its entry into the generic segment, again before Brown & Williamson had sold any generic cigarettes, Liggett filed a complaint in the United States District Court for the Middle District of North Carolina alleging trademark infringement and unfair competition. Liggett later amended its complaint to add an antitrust claim under § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13(a), which alleged illegal price discrimination between Brown & Williamson's full-priced branded cigarettes and its low-priced generics. See *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 1989–1 Trade Cas. (CCH) ¶ 68,583, p. 61,099 (MDNC 1988). These claims were either dismissed on summary judgment, see *ibid.*, or rejected by the jury. They were not appealed.

Liggett also amended its complaint to add a second Robinson-Patman Act claim, which is the subject of the present controversy. Liggett alleged that Brown & Williamson's volume rebates to wholesalers amounted to price discrimination that had a reasonable possibility of injuring competition,

in violation of § 2(a). Liggett claimed that Brown & Williamson's discriminatory volume rebates were integral to a scheme of predatory pricing, in which Brown & Williamson reduced its net prices for generic cigarettes below average variable costs. According to Liggett, these below-cost prices were not promotional but were intended to pressure it to raise its list prices on generic cigarettes, so that the percentage price difference between generic and branded cigarettes would narrow. Liggett explained that it would have been unable to reduce its wholesale rebates without losing substantial market share to Brown & Williamson; its only choice, if it wished to avoid prolonged losses on its principal product line, was to raise retail prices. The resulting reduction in the list price gap, it was said, would restrain the growth of the economy segment and preserve Brown & Williamson's supracompetitive profits on its branded cigarettes.

The trial began in the fall of 1989. By that time, all six cigarette companies had entered the economy segment. The economy segment was the fastest growing segment of the cigarette market, having increased from about 4% of the market in 1984, when the rebate war in generics began, to about 15% in 1989. Black and white generics had declined as a force in the economy segment as consumer interest shifted toward branded generics, but Liggett's overall volume had increased steadily to 9 billion generic cigarettes sold. Overall, the 2.8 billion generic cigarettes sold in 1981 had become 80 billion by 1989.

The consumer price of generics had increased along with output. For a year, the list prices for generic cigarettes established at the end of the rebate war remained stable. But in June 1985, Liggett raised its list price, and the other firms followed several months later. The precise effect of the list price increase is difficult to assess, because all of the cigarette firms offered a variety of discounts, coupons, and other promotions directly to consumers on both generic and

branded cigarettes. Nonetheless, at least some portion of the list price increase was reflected in a higher net price to the consumer.

In December 1985, Brown & Williamson attempted to increase its list prices, but retracted the announced increase when the other firms adhered to their existing prices. Thus, after Liggett's June 1985 increase, list prices on generics did not change again until the summer of 1986, when a pattern of twice yearly increases in tandem with the full-priced branded cigarettes was established. The dollar amount of these increases was the same for generic and full-priced cigarettes, which resulted in a greater percentage price increase in the less expensive generic cigarettes and a narrowing of the percentage gap between the list price of branded and black and white cigarettes, from approximately 38% at the time Brown & Williamson entered the segment to approximately 27% at the time of trial. Also by the time of trial, five of the six manufacturers, including Liggett, had introduced so-called "subgenerics," a category of branded generic cigarettes that sold at a discount of 50% or more off the list price of full-priced branded cigarettes.

After a 115-day trial involving almost 3,000 exhibits and over a score of witnesses, the jury returned a verdict in favor of Liggett, finding on the special verdict form that Brown & Williamson had engaged in price discrimination that had a reasonable possibility of injuring competition in the domestic cigarette market as a whole. The jury awarded Liggett $49.6 million in damages, which the District Court trebled to $148.8 million. After reviewing the record, however, the District Court held that Brown & Williamson was entitled to judgment as a matter of law on three separate grounds: lack of injury to competition, lack of antitrust injury to Liggett, and lack of a causal link between the discriminatory rebates and Liggett's alleged injury. *Liggett Group, Inc.* v. *Brown & Williamson Tobacco Corp.*, 748 F. Supp. 344 (MDNC 1990). With respect to the first issue, which is the

only one before us, the District Court found that no slowing of the growth rate of generics, and thus no injury to competition, was possible unless there had been tacit coordination of prices in the economy segment of the cigarette market by the various manufacturers. *Id.*, at 354–355. The District Court held that a reasonable jury could come to but one conclusion about the existence of such coordination among the firms contending for shares of the economy segment: it did not exist, and Brown & Williamson therefore had no reasonable possibility of limiting the growth of the segment. *Id.*, at 356–358.

The United States Court of Appeals for the Fourth Circuit affirmed. *Liggett Group, Inc.* v. *Brown & Williamson Tobacco Corp.*, 964 F. 2d 335 (1992). The Court of Appeals held that the dynamic of conscious parallelism among oligopolists could not produce competitive injury in a predatory pricing setting, which necessarily involves a price cut by one of the oligopolists. *Id.*, at 342. In the Court of Appeals' view, "[t]o rely on the characteristics of an oligopoly to assure recoupment of losses from a predatory pricing scheme after one oligopolist has made a competitive move is . . . economically irrational." *Ibid.*

We granted certiorari, 506 U. S. 984 (1992), and now affirm.

## II

### A

Price discrimination is made unlawful by § 2(a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, which provides:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent

competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 15 U. S. C. § 13(a).

Although we have reiterated that "'a price discrimination within the meaning of [this] provision is merely a price difference,'" *Texaco Inc.* v. *Hasbrouck,* 496 U. S. 543, 558 (1990) (quoting *FTC* v. *Anheuser-Busch, Inc.,* 363 U. S. 536, 549 (1960)), the statute as a practical matter could not, and does not, ban all price differences charged to "different purchasers of commodities of like grade and quality." Instead, the statute contains a number of important limitations, one of which is central to evaluating Liggett's claim: By its terms, the Robinson-Patman Act condemns price discrimination only to the extent that it threatens to injure competition. The availability of statutory defenses permitting price discrimination when it is based on differences in costs, § 13(a), "changing conditions affecting the market for or the marketability of the goods concerned," *ibid.,* or conduct undertaken "in good faith to meet an equally low price of a competitor," § 13(b); *Standard Oil Co.* v. *FTC,* 340 U. S. 231, 250 (1951), confirms that Congress did not intend to outlaw price differences that result from or further the forces of competition. Thus, "the Robinson-Patman Act should be construed consistently with broader policies of the antitrust laws." *Great Atlantic & Pacific Tea Co.* v. *FTC,* 440 U. S. 69, 80, n. 13 (1979). See also *Automatic Canteen Co. of America* v. *FTC,* 346 U. S. 61, 63, 74 (1953).

Liggett contends that Brown & Williamson's discriminatory volume rebates to wholesalers threatened substantial competitive injury by furthering a predatory pricing scheme designed to purge competition from the economy segment of the cigarette market. This type of injury, which harms direct competitors of the discriminating seller, is known as primary-line injury. See *FTC* v. *Anheuser-Busch, Inc., supra,* at 538. We last addressed primary-line injury over 25 years ago, in *Utah Pie Co.* v. *Continental Baking Co.,*

386 U. S. 685 (1967). In *Utah Pie,* we reviewed the sufficiency of the evidence supporting jury verdicts against three national pie companies that had engaged in a variety of predatory practices in the market for frozen pies in Salt Lake City, with the intent to drive a local pie manufacturer out of business. We reversed the Court of Appeals and held that the evidence presented was adequate to permit a jury to find a likelihood of injury to competition. *Id.,* at 703.

*Utah Pie* has often been interpreted to permit liability for primary-line price discrimination on a mere showing that the defendant intended to harm competition or produced a declining price structure. The case has been criticized on the ground that such low standards of competitive injury are at odds with the antitrust laws' traditional concern for consumer welfare and price competition. See Bowman, Restraint of Trade by the Supreme Court: The Utah Pie Case, 77 Yale L. J. 70 (1967); R. Posner, Antitrust Law: An Economic Perspective 193–194 (1976); L. Sullivan, Antitrust 687 (1977); 3 P. Areeda & D. Turner, Antitrust Law ¶ 720c (1978) (hereinafter Areeda & Turner); R. Bork, The Antitrust Paradox 386–387 (1978); H. Hovenkamp, Economics and Federal Antitrust Law 188–189 (1985). We do not regard the *Utah Pie* case itself as having the full significance attributed to it by its detractors. *Utah Pie* was an early judicial inquiry in this area and did not purport to set forth explicit, general standards for establishing a violation of the Robinson-Patman Act. As the law has been explored since *Utah Pie,* it has become evident that primary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act. See, *e. g., Henry* v. *Chloride, Inc.,* 809 F. 2d 1334, 1345 (CA8 1987); *D. E. Rogers Associates, Inc.* v. *Gardner-Denver Co.,* 718 F. 2d 1431, 1439 (CA6 1983), cert. denied, 467 U. S. 1242 (1984); *William Inglis & Sons Baking Co.* v. *ITT Continental Baking Co.,* 668 F. 2d 1014, 1041 (CA9 1981), cert. denied, 459 U. S. 825 (1982);

*Malcolm* v. *Marathon Oil Co.*, 642 F. 2d 845, 853, n. 16 (CA5), cert. denied, 454 U. S. 1125 (1981); *Pacific Engineering & Production Co. of Nevada* v. *Kerr-McGee Corp.*, 551 F. 2d 790, 798 (CA10), cert. denied, 434 U. S. 879 (1977); *International Telephone & Telegraph Corp.*, 104 F. T. C. 280, 401–402 (1984); Hovenkamp, *supra*, at 189; 3 Areeda & Turner ¶ 720c; P. Areeda & H. Hovenkamp, Antitrust Law ¶ 720c (Supp. 1992) (hereinafter Areeda & Hovenkamp). There are, to be sure, differences between the two statutes. For example, we interpret § 2 of the Sherman Act to condemn predatory pricing when it poses "a dangerous probability of actual monopolization," *Spectrum Sports, Inc.* v. *McQuillan*, 506 U. S. 447, 455 (1993), whereas the Robinson-Patman Act requires only that there be "a reasonable possibility" of substantial injury to competition before its protections are triggered, *Falls City Industries, Inc.* v. *Vanco Beverage, Inc.*, 460 U. S. 428, 434 (1983). But whatever additional flexibility the Robinson-Patman Act standard may imply, the essence of the claim under either statute is the same: A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market.

Accordingly, whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, two prerequisites to recovery remain the same. First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs.[1] See, *e. g., Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104, 117 (1986); *Mat-*

---

[1] Because the parties in this case agree that the relevant measure of cost is average variable cost, however, we again decline to resolve the conflict among the lower courts over the appropriate measure of cost. See *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104, 117–118, n. 12 (1986); *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 585, n. 8 (1986).

*sushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 585, n. 8 (1986); *Utah Pie*, 386 U. S., at 698, 701, 702–703, n. 14; *In re E. I. DuPont de Nemours & Co.*, 96 F. T. C. 653, 749 (1980). Cf. *United States* v. *National Dairy Products Corp.*, 372 U. S. 29 (1963) (holding that below-cost prices may constitute "unreasonably low" prices for purposes of §3 of the Robinson-Patman Act, 15 U. S. C. § 13a). Although *Cargill* and *Matsushita* reserved as a formal matter the question " 'whether recovery should *ever* be available . . . when the pricing in question is above some measure of incremental cost,' " *Cargill, supra*, at 117–118, n. 12 (quoting *Matsushita, supra*, at 585, n. 9), the reasoning in both opinions suggests that only below-cost prices should suffice, and we have rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws. See *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U. S. 328, 340 (1990). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. . . . We have adhered to this principle regardless of the type of antitrust claim involved." *Ibid.* As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price cutting. See Areeda & Hovenkamp ¶¶ 714.2, 714.3. "To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result." *Cargill, supra*, at 116.

Even in an oligopolistic market, when a firm drops its prices to a competitive level to demonstrate to a maverick the unprofitability of straying from the group, it would be

illogical to condemn the price cut: The antitrust laws then would be an obstacle to the chain of events most conducive to a breakdown of oligopoly pricing and the onset of competition. Even if the ultimate effect of the cut is to induce or reestablish supracompetitive pricing, discouraging a price cut and forcing firms to maintain supracompetitive prices, thus depriving consumers of the benefits of lower prices in the interim, does not constitute sound antitrust policy. Cf. Areeda & Hovenkamp ¶¶ 714.2d, 714.2f; Areeda & Turner, Predatory Pricing and Related Practices under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 708–709 (1975); Posner, Antitrust Law: An Economic Perspective, at 195, n. 39.

The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under §2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices. See *Matsushita, supra,* at 589; *Cargill, supra,* at 119, n. 15. "For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered." *Matsushita, supra,* at 588–589. Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers.

That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for "the protection of *competition,* not *competitors.*" *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 320 (1962). Earlier this Term, we held in the Sherman Act §2 context

that it was not enough to inquire "whether the defendant has engaged in 'unfair' or 'predatory' tactics"; rather, we insisted that the plaintiff prove "a dangerous probability that [the defendant] would monopolize a particular market." *Spectrum Sports*, 506 U. S., at 459. Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt* v. *Crumboch*, 325 U. S. 821, 826 (1945).

For recoupment to occur, below-cost pricing must be capable, as a threshold matter, of producing the intended effects on the firm's rivals, whether driving them from the market, or, as was alleged to be the goal here, causing them to raise their prices to supracompetitive levels within a disciplined oligopoly. This requires an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will. See 3 Areeda & Turner ¶ 711b. The inquiry is whether, given the aggregate losses caused by the below-cost pricing, the intended target would likely succumb.

If circumstances indicate that below-cost pricing could likely produce its intended effect on the target, there is still the further question whether it would likely injure competition in the relevant market. The plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it. As we have observed on a prior occasion, "[i]n order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess

profits what they earlier gave up in below-cost prices."
*Matsushita*, 475 U. S., at 590–591.

Evidence of below-cost pricing is not alone sufficient to
permit an inference of probable recoupment and injury to
competition. Determining whether recoupment of preda-
tory losses is likely requires an estimate of the cost of the
alleged predation and a close analysis of both the scheme
alleged by the plaintiff and the structure and conditions of
the relevant market. Cf., *e. g.*, Elzinga & Mills, Testing for
Predation: Is Recoupment Feasible?, 34 Antitrust Bull. 869
(1989) (constructing one possible model for evaluating re-
coupment). If market circumstances or deficiencies in proof
would bar a reasonable jury from finding that the scheme
alleged would likely result in sustained supracompetitive
pricing, the plaintiff's case has failed. In certain situa-
tions—for example, where the market is highly diffuse and
competitive, or where new entry is easy, or the defendant
lacks adequate excess capacity to absorb the market shares
of his rivals and cannot quickly create or purchase new
capacity—summary disposition of the case is appropriate.
See, *e. g.*, *Cargill*, 479 U. S., at 119–120, n. 15.

These prerequisites to recovery are not easy to establish,
but they are not artificial obstacles to recovery; rather, they
are essential components of real market injury. As we have
said in the Sherman Act context, "predatory pricing schemes
are rarely tried, and even more rarely successful," *Matsu-
shita, supra*, at 589, and the costs of an erroneous finding of
liability are high. "[T]he mechanism by which a firm en-
gages in predatory pricing—lowering prices—is the same
mechanism by which a firm stimulates competition; because
'cutting prices in order to increase business often is the very
essence of competition . . . [;] mistaken inferences . . . are
especially costly, because they chill the very conduct the an-
titrust laws are designed to protect.'" *Cargill, supra*, at
122, n. 17 (quoting *Matsushita, supra*, at 594). It would be
ironic indeed if the standards for predatory pricing liability

were so low that antitrust suits themselves became a tool for keeping prices high.

## B

Liggett does not allege that Brown & Williamson sought to drive it from the market but that Brown & Williamson sought to preserve supracompetitive profits on branded cigarettes by pressuring Liggett to raise its generic cigarette prices through a process of tacit collusion with the other cigarette companies. Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions. See 2 Areeda & Turner ¶ 404; Scherer & Ross 199–208.

In *Matsushita,* we remarked upon the general implausibility of predatory pricing. See 475 U. S., at 588–590. *Matsushita* observed that such schemes are even more improbable when they require coordinated action among several firms. *Id.,* at 590. *Matsushita* involved an allegation of an express conspiracy to engage in predatory pricing. The Court noted that in addition to the usual difficulties that face a single firm attempting to recoup predatory losses, other problems render a conspiracy "incalculably more difficult to execute." *Ibid.* In order to succeed, the conspirators must agree on how to allocate present losses and future gains among the firms involved, and each firm must resist powerful incentives to cheat on whatever agreement is reached. *Ibid.*

However unlikely predatory pricing by multiple firms may be when they conspire, it is even less likely when, as here, there is no express coordination. Firms that seek to recoup predatory losses through the conscious parallelism of oligopoly must rely on uncertain and ambiguous signals to achieve concerted action. The signals are subject to misinterpretation and are a blunt and imprecise means of ensuring smooth

cooperation, especially in the context of changing or unprecedented market circumstances. This anticompetitive minuet is most difficult to compose and to perform, even for a disciplined oligopoly.

From one standpoint, recoupment through oligopolistic price coordination could be thought more feasible than recoupment through monopoly: In the oligopoly setting, the victim itself has an economic incentive to acquiesce in the scheme. If forced to choose between cutting prices and sustaining losses, maintaining prices and losing market share, or raising prices and enjoying a share of supracompetitive profits, a firm may yield to the last alternative. Yet on the whole, tacit cooperation among oligopolists must be considered the least likely means of recouping predatory losses. In addition to the difficulty of achieving effective tacit coordination and the high likelihood that any attempt to discipline will produce an outbreak of competition, the predator's present losses in a case like this fall on it alone, while the later supracompetitive profits must be shared with every other oligopolist in proportion to its market share, including the intended victim. In this case, for example, Brown & Williamson, with its 11–12% share of the cigarette market, would have had to generate around $9 in supracompetitive profits for each $1 invested in predation; the remaining $8 would belong to its competitors, who had taken no risk.

Liggett suggests that these considerations led the Court of Appeals to rule out its theory of recovery as a matter of law. Although the proper interpretation of the Court of Appeals' opinion is not free from doubt, there is some indication that it held as a matter of law that the Robinson-Patman Act does not reach a primary-line injury claim in which tacit coordination among oligopolists provides the alleged basis for recoupment. The Court of Appeals' opinion does not contain the traditional apparatus of fact review; rather, it focuses on theoretical and legal arguments. The final paragraph appears to state the holding: Brown & Williamson

may not be held liable because oligopoly pricing does not "'provide an economically rational basis'" for recouping predatory losses. 964 F. 2d, at 342.

To the extent that the Court of Appeals may have held that the interdependent pricing of an oligopoly may never provide a means for achieving recoupment and so may not form the basis of a primary-line injury claim, we disagree. A predatory pricing scheme designed to preserve or create a stable oligopoly, if successful, can injure consumers in the same way, and to the same extent, as one designed to bring about a monopoly. However unlikely that possibility may be as a general matter, when the realities of the market and the record facts indicate that it has occurred and was likely to have succeeded, theory will not stand in the way of liability. See *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U. S. 451, 466–467 (1992).

The Robinson-Patman Act, which amended § 2 of the original Clayton Act, suggests no exclusion from coverage when primary-line injury occurs in an oligopoly setting. Unlike the provisions of the Sherman Act, which speak only of various forms of express agreement and monopoly, see 15 U. S. C. §§ 1, 2, the Robinson-Patman Act is phrased in broader, disjunctive terms, prohibiting price discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly," 15 U. S. C. § 13(a). For all the words of the Act to carry adequate meaning, competitive injury under the Act must extend beyond the monopoly setting. Cf. *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise"). The language referring to a substantial lessening of competition was part of the original Clayton Act § 2, see Act of Oct. 15, 1914, ch. 322, 38 Stat. 730, and the same phrasing appears in § 7 of that Act. In the § 7 context, it has long been settled that excessive concentration, and the oligopolistic price coordina-

tion it portends, may be the injury to competition the Act prohibits. See, *e. g., United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321 (1963). We adhere to "the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan* v. *Stroop*, 496 U. S. 478, 484 (1990) (internal quotation marks omitted). See also *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S. 557, 562 (1981) (evaluating the competitive injury requirement of Robinson-Patman Act § 2(a) in light of analogous interpretations of Clayton Act § 7). We decline to create a *per se* rule of nonliability for predatory price discrimination when recoupment is alleged to take place through supracompetitive oligopoly pricing. Cf. *Cargill*, 479 U. S., at 121.

## III

Although Liggett's theory of liability, as an abstract matter, is within the reach of the statute, we agree with the Court of Appeals and the District Court that Liggett was not entitled to submit its case to the jury. It is not customary for this Court to review the sufficiency of the evidence, but we will do so when the issue is properly before us and the benefits of providing guidance concerning the proper application of a legal standard and avoiding the systemic costs associated with further proceedings justify the required expenditure of judicial resources. See, *e. g., Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U. S. 585, 605–611 (1985); *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 765–768 (1984); *United States* v. *Pabst Brewing Co.*, 384 U. S. 546, 550–552 (1966). The record in this case demonstrates that the anticompetitive scheme Liggett alleged, when judged against the realities of the market, does not provide an adequate basis for a finding of liability.

## A

Liggett's theory of competitive injury through oligopolistic price coordination depends upon a complex chain of cause

and effect: Brown & Williamson would enter the generic segment with list prices matching Liggett's but with massive, discriminatory volume rebates directed at Liggett's biggest wholesalers; as a result, the net price of Brown & Williamson's generics would be below its costs; Liggett would suffer losses trying to defend its market share and wholesale customer base by matching Brown & Williamson's rebates; to avoid further losses, Liggett would raise its list prices on generics or acquiesce in price leadership by Brown & Williamson; higher list prices to consumers would shrink the percentage gap in retail price between generic and branded cigarettes; and this narrowing of the gap would make generics less appealing to the consumer, thus slowing the growth of the economy segment and reducing cannibalization of branded sales and their associated supracompetitive profits.

Although Brown & Williamson's entry into the generic segment could be regarded as procompetitive in intent as well as effect, the record contains sufficient evidence from which a reasonable jury could conclude that Brown & Williamson envisioned or intended this anticompetitive course of events. See, *e. g.*, App. 57–58, 67–68, 89–91, 99, 112–114, 200, 241, 253, 257, 262–263, 279–280, 469–470, 664–666. There is also sufficient evidence in the record from which a reasonable jury could conclude that for a period of approximately 18 months, Brown & Williamson's prices on its generic cigarettes were below its costs, see *id.*, at 338–339, 651, 740, and that this below-cost pricing imposed losses on Liggett that Liggett was unwilling to sustain, given its corporate parent's effort to locate a buyer for the company, see *id.*, at 74, 92, 200, 253, 596–597. Liggett has failed to demonstrate competitive injury as a matter of law, however, because its proof is flawed in a critical respect: The evidence is inadequate to show that in pursuing this scheme, Brown & Williamson had a reasonable prospect of recovering its losses from below-cost pricing through slowing the growth of generics. As we have noted, "[t]he success of any predatory

scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." *Matsushita*, 475 U. S., at 589 (emphasis omitted).

No inference of recoupment is sustainable on this record, because no evidence suggests that Brown & Williamson—whatever its intent in introducing black and whites may have been—was likely to obtain the power to raise the prices for generic cigarettes above a competitive level. Recoupment through supracompetitive pricing in the economy segment of the cigarette market is an indispensable aspect of Liggett's own proffered theory, because a slowing of growth in the economy segment, even if it results from an increase in generic prices, is not itself anticompetitive. Only if those higher prices are a product of nonmarket forces has competition suffered. If prices rise in response to an excess of demand over supply, or segment growth slows as patterns of consumer preference become stable, the market is functioning in a competitive manner. Consumers are not injured from the perspective of the antitrust laws by the price increases; they are in fact causing them. Thus, the linchpin of the predatory scheme alleged by Liggett is Brown & Williamson's ability, with the other oligopolists, to raise prices above a competitive level in the generic segment of the market. Because relying on tacit coordination among oligopolists as a means of recouping losses from predatory pricing is "highly speculative," Areeda & Hovenkamp ¶ 711.2c, at 647, competent evidence is necessary to allow a reasonable inference that it poses an authentic threat to competition. The evidence in this case is insufficient to demonstrate the danger of Brown & Williamson's alleged scheme.

## B

Based on Liggett's theory of the case and the record it created, there are two means by which one might infer that

Brown & Williamson had a reasonable prospect of producing sustained supracompetitive pricing in the generic segment adequate to recoup its predatory losses: first, if generic output or price information indicates that oligopolistic price coordination in fact produced supracompetitive prices in the generic segment; or second, if evidence about the market and Brown & Williamson's conduct indicate that the alleged scheme was likely to have brought about tacit coordination and oligopoly pricing in the generic segment, even if it did not actually do so.

1

In this case, the price and output data do not support a reasonable inference that Brown & Williamson and the other cigarette companies elevated prices above a competitive level for generic cigarettes. Supracompetitive pricing entails a restriction in output. See *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 104–108 (1984); *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 19–20 (1979); P. Samuelson & W. Nordhaus, Economics 516 (12th ed. 1985); Sullivan, Antitrust, at 32; Bork, The Antitrust Paradox, at 178–179; 2 Areeda & Turner ¶ 403a; Easterbrook, The Limits of Antitrust, 63 Texas L. Rev. 1, 20, 31 (1984). In the present setting, in which output expanded at a rapid rate following Brown & Williamson's alleged predation, output in the generic segment can only have been restricted in the sense that it expanded at a slower rate than it would have absent Brown & Williamson's intervention. Such a counterfactual proposition is difficult to prove in the best of circumstances; here, the record evidence does not permit a reasonable inference that output would have been greater without Brown & Williamson's entry into the generic segment.

Following Brown & Williamson's entry, the rate at which generic cigarettes were capturing market share did not slow; indeed, the average rate of growth doubled. During the

four years from 1980 to 1984 in which Liggett was alone in the generic segment, the segment gained market share at an average rate of 1% of the overall market per year, from 0.4% in 1980 to slightly more than 4% of the cigarette market in 1984. In the next five years, following the alleged predation, the generic segment expanded from 4% to more than 15% of the domestic cigarette market, or greater than 2% per year.

While this evidence tends to show that Brown & Williamson's participation in the economy segment did not restrict output, it is not dispositive. One could speculate, for example, that the rate of segment growth would have tripled, instead of doubled, without Brown & Williamson's alleged predation. But there is no concrete evidence of this. Indeed, the only industry projection in the record estimating what the segment's growth would have been without Brown & Williamson's entry supports the opposite inference. In 1984, Brown & Williamson forecast in an important planning document that the economy segment would account for 10% of the total cigarette market by 1988 if it did not enter the segment. App. 133, 135. In fact, in 1988, after what Liggett alleges was a sustained and dangerous anticompetitive campaign by Brown & Williamson, the generic segment accounted for over 12% of the total market. *Id.*, at 354–356. Thus the segment's output expanded more robustly than Brown & Williamson had estimated it would had Brown & Williamson never entered.

Brown & Williamson did note in 1985, a year after introducing its black and whites, that its presence within the generic segment "appears to have resulted in . . . a slowing in the segment's growth rate." *Id.*, at 257. But this statement was made in early 1985, when Liggett itself contends the below-cost pricing was still in effect and before any anticompetitive contraction in output is alleged to have occurred.

Whatever it may mean,[2] this statement has little value in evaluating the competitive implications of Brown & Williamson's later conduct, which was alleged to provide the basis for recouping predatory losses.

In arguing that Brown & Williamson was able to exert market power and raise generic prices above a competitive level in the generic category through tacit price coordination with the other cigarette manufacturers, Liggett places its principal reliance on direct evidence of price behavior. This evidence demonstrates that the list prices on all cigarettes, generic and branded alike, rose to a significant degree during the late 1980's. *Id.*, at 325. From 1986 to 1989, list prices on both generic and branded cigarettes increased twice a year by similar amounts. Liggett's economic expert testified that these price increases outpaced increases in costs, taxes, and promotional expenditures. *Id.*, at 525. The list prices of generics, moreover, rose at a faster rate than the prices of branded cigarettes, thus narrowing the list price differential between branded and generic products. *Id.*, at 325. Liggett argues that this would permit a reasonable jury to find that Brown & Williamson succeeded in bringing about oligopolistic price coordination and supracompetitive prices in the generic category sufficient to slow its growth, thereby preserving supracompetitive branded profits and recouping its predatory losses.

A reasonable jury, however, could not have drawn the inferences Liggett proposes. All of Liggett's data are based upon the list prices of various categories of cigarettes. Yet the jury had before it undisputed evidence that during the period in question, list prices were not the actual prices paid by consumers. 100 Tr. 227–229. As the market became un-

---

[2] This statement could well have referred to the rate at which the segment was growing relative to prior years' generic volume; this "internal" rate of growth would inevitably slow as the base volume against which it was measured grew.

settled in the mid-1980's, the cigarette companies invested substantial sums in promotional schemes, including coupons, stickers, and giveaways, that reduced the actual cost of cigarettes to consumers below list prices. 33 Tr. 206–209, 51 Tr. 130. This promotional activity accelerated as the decade progressed. App. 509, 672. Many wholesalers also passed portions of their volume rebates on to the consumer, which had the effect of further undermining the significance of the retail list prices. *Id.*, at 672, 687–692, 761–763. Especially in an oligopoly setting, in which price competition is most likely to take place through less observable and less regulable means than list prices, it would be unreasonable to draw conclusions about the existence of tacit coordination or supracompetitive pricing from data that reflect only list prices.

Even on its own terms, the list price data relied upon by Liggett to demonstrate a narrowing of the price differential between generic and full-priced branded cigarettes could not support the conclusion that supracompetitive pricing had been introduced into the generic segment. Liggett's gap data ignore the effect of "subgeneric" cigarettes, which were priced at discounts of 50% or more from the list prices of normal branded cigarettes. See, *e. g., id.*, at 682–686. Liggett itself, while supposedly under the sway of oligopoly power, pioneered this development in 1988 with the introduction of its "Pyramid" brand. *Id.*, at 326. By the time of trial, five of the six major manufacturers offered a cigarette in this category at a discount from the full list price of at least 50%. *Id.*, at 685–686; 147 Tr. 107. Thus, the price difference between the highest priced branded cigarette and the lowest price cigarettes in the economy segment, instead of narrowing over the course of the period of alleged predation as Liggett would argue, grew to a substantial extent. In June 1984, before Brown & Williamson entered the generic segment, a consumer could obtain a carton of black and white generic cigarettes from Liggett at a 38% discount from the list price of a leading brand; after the conduct Liggett

complains of, consumers could obtain a branded generic from Liggett for 52% off the list price of a leading brand. See App. 325–326, 685.

It may be that a reasonable jury could conclude that the cumulative discounts attributable to subgenerics and the various consumer promotions did not cancel out the full effect of the increases in list prices, see *id.*, at 508–509, and that actual prices to the consumer did indeed rise, but rising prices do not themselves permit an inference of a collusive market dynamic. Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing. Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand. Under these conditions, a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level. Cf. *Monsanto*, 465 U. S., at 763.

Quite apart from the absence of any evidence of that sort, an inference of supracompetitive pricing would be particularly anomalous in this case, as the very party alleged to have been coerced into pricing through oligopolistic coordination denied that such coordination existed: Liggett's own officers and directors consistently denied that they or other firms in the industry priced their cigarettes through tacit collusion or reaped supracompetitive profits. App. 394–399, 623–631; 11 Tr. 170–174, 64 Tr. 51–56. Liggett seeks to explain away this testimony by arguing that its officers and directors are businesspeople who do not ascribe the same meaning to words like "competitive" and "collusion" that an economist would. This explanation is entitled to little, if any, weight. As the District Court found:

> "This argument was considered at the summary judgment stage since these executives gave basically the same testimony at their depositions. The court allowed

the case to go to trial in part because the Liggett executives were not economists and in part because of affidavits from the Liggett executives stating that they were confused by the questions asked by B[rown] & W[illiamson] lawyers and did not mean to contradict the testimony of [their economic expert] Burnett. However, at trial, despite having consulted extensively with Burnett and having had adequate time to familiarize themselves with concepts such as tacit collusion, oligopoly, and monopoly profits, these Liggett executives again contradicted Burnett's theory." 748 F. Supp., at 356.

2

Not only does the evidence fail to show actual supracompetitive pricing in the generic segment, it also does not demonstrate its likelihood. At the time Brown & Williamson entered the generic segment, the cigarette industry as a whole faced declining demand and possessed substantial excess capacity. App. 82–84. These circumstances tend to break down patterns of oligopoly pricing and produce price competition. See Scherer & Ross 294, 315; 2 Areeda & Turner ¶ 404b2, at 275–276; 6 P. Areeda, Antitrust Law ¶ 1430e, p. 181 (1986). The only means by which Brown & Williamson is alleged to have established oligopoly pricing in the face of these unusual competitive pressures is through tacit price coordination with the other cigarette firms.

Yet the situation facing the cigarette companies in the 1980's would have made such tacit coordination unmanageable. Tacit coordination is facilitated by a stable market environment, fungible products, and a small number of variables upon which the firms seeking to coordinate their pricing may focus. See generally Scherer & Ross 215–315; 6 P. Areeda, supra, ¶¶ 1428–1430. Uncertainty is an oligopoly's greatest enemy. By 1984, however, the cigarette market was in an obvious state of flux. The introduction of generic cigarettes in 1980 represented the first serious price com-

petition in the cigarette market since the 1930's. See Scherer & Ross 250–251; App. 128. This development was bound to unsettle previous expectations and patterns of market conduct and to reduce the cigarette firms' ability to predict each other's behavior.

The larger number of product types and pricing variables also decreased the probability of effective parallel pricing. When Brown & Williamson entered the economy segment in 1984, the segment included Value-25s, black and whites, and branded generics. With respect to each product, the net price in the market was determined not only by list prices, but also by a wide variety of discounts and promotions to consumers and by rebates to wholesalers. In order to coordinate in an effective manner and eliminate price competition, the cigarette companies would have been required, without communicating, to establish parallel practices with respect to each of these variables, many of which, like consumer stickers or coupons, were difficult to monitor. Liggett has not even alleged parallel behavior with respect to these other variables, and the inherent limitations of tacit collusion suggest that such multivariable coordination is improbable. See R. Dorfman, The Price System 99–100, and n. 10 (1964); Scherer & Ross 279.

In addition, R. J. Reynolds had incentives that, in some respects, ran counter to those of the other cigarette companies. It is implausible that without a shared interest in retarding the growth of the economy segment, Brown & Williamson and its fellow oligopolists could have engaged in parallel pricing and raised generic prices above a competitive level. "[C]oordination will not be possible when any significant firm chooses, for any reason, to 'go it alone.'" 2 Areeda & Turner ¶ 404b2, at 276. It is undisputed—indeed it was conceded by Liggett's expert—that R. J. Reynolds acted without regard to the supposed benefits of oligopolistic coordination when it repriced Doral at generic levels in the spring of 1984 and that the natural and probable consequence

of its entry into the generic segment was procompetitive. 55 Tr. 15–16; 51 Tr. 128. Indeed, Reynolds' apparent objective in entering the segment was to capture a significant amount of volume in order to regain its number one sales position in the cigarette industry from Philip Morris. App. 75, 130, 209–211. There is no evidence that R. J. Reynolds accomplished this goal during the period relevant to this case, or that its commitment to achieving that goal changed. Indeed, R. J. Reynolds refused to follow Brown & Williamson's attempt to raise generic prices in June 1985. The jury thus had before it undisputed evidence that contradicts the suggestion that the major cigarette companies shared a goal of limiting the growth of the economy segment; one of the industry's two major players concededly entered the segment to expand volume and compete.

Even if all the cigarette companies were willing to participate in a scheme to restrain the growth of the generic segment, they would not have been able to coordinate their actions and raise prices above a competitive level unless they understood that Brown & Williamson's entry into the segment was not a genuine effort to compete with Liggett. If even one other firm misinterpreted Brown & Williamson's entry as an effort to expand share, a chain reaction of competitive responses would almost certainly have resulted, and oligopoly discipline would have broken down, perhaps irretrievably. "[O]nce the trust among rivals breaks down, it is as hard to put back together again as was Humpty-Dumpty, and non-collusive behavior is likely to take over." Samuelson & Nordhaus, Economics, at 534.

Liggett argues that the means by which Brown & Williamson signaled its anticompetitive intent to its rivals was through its pricing structure. According to Liggett, maintaining existing list prices while offering substantial rebates to wholesalers was a signal to the other cigarette firms that Brown & Williamson did not intend to attract additional smokers to the generic segment by its entry. But a reason-

able jury could not conclude that this pricing structure eliminated or rendered insignificant the risk that the other firms might misunderstand Brown & Williamson's entry as a competitive move. The likelihood that Brown & Williamson's rivals would have regarded its pricing structure as an important signal is low, given that Liggett itself, the purported target of the predation, was already using similar rebates, as was R. J. Reynolds in marketing its Doral branded generic. A Reynolds executive responsible for Doral testified that given its and Liggett's use of wholesaler rebates, Brown & Williamson could not have competed effectively without them. App. 756. And despite extensive discovery of the corporate records of R. J. Reynolds and Philip Morris, no documents appeared that indicated any awareness of Brown & Williamson's supposed signal by its principal rivals. Without effective signaling, it is difficult to see how the alleged predation could have had a reasonable chance of success through oligopoly pricing.

Finally, although some of Brown & Williamson's corporate planning documents speak of a desire to slow the growth of the segment, no objective evidence of its conduct permits a reasonable inference that it had any real prospect of doing so through anticompetitive means. It is undisputed that when Brown & Williamson introduced its generic cigarettes, it offered them to a thousand wholesalers who had never before purchased generic cigarettes. Record, Plaintiff's Exh. No. 4079; 87 Tr. 191; 88 Tr. 143–147. The inevitable effect of this marketing effort was to expand the segment, as the new wholesalers recruited retail outlets to carry generic cigarettes. Even with respect to wholesalers already carrying generics, Brown & Williamson's unprecedented volume rebates had a similar expansionary effect. Unlike many branded cigarettes, generics came with no sales guarantee to the wholesaler; any unsold stock represented pure loss to the wholesaler. By providing substantial incentives for wholesalers to place large orders, Brown & Williamson cre-

·ated strong pressure for them to sell more generic cigarettes. In addition, as we have already observed, see *supra,* at 236, many wholesalers passed portions of the rebates about which Liggett complains on to consumers, thus dropping the retail price of generics and further stimulating demand.    Brown & Williamson provided a further, direct stimulus, through some $10 million it spent during the period of alleged predation placing discount stickers on its generic cartons to reduce prices to the ultimate consumer.    70 Tr. 246.    In light of these uncontested facts about Brown & Williamson's conduct, it is not reasonable to conclude that Brown & Williamson threatened in a serious way to restrict output, raise prices above a competitive level, and artificially slow the growth of the economy segment of the national cigarette market.

To be sure, Liggett's economic expert explained Liggett's theory of predatory price discrimination and testified that he believed it created a reasonable possibility that Brown & Williamson could injure competition in the United States cigarette market as a whole.    App. 600–614.    But this does not alter our analysis.    When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.    Cf. *J. Truett Payne Co., Inc.,* 451 U. S., at 564–565 (referring to expert economic testimony not based on "documentary evidence as to the effect of the discrimination on retail prices" as "weak" at best).    Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.    As we observed in *Matsushita,* "expert opinion evidence . . . has little probative value in comparison with the economic factors" that may dictate a particular conclusion.    475 U. S., at 594, n. 19.    Here, Liggett's expert based his opinion that Brown & Williamson had a reasonable prospect of recouping its predatory losses on three factors: Brown & Williamson's black and white pricing structure, cor-

porate documents showing an intent to shrink the price differential between generic and branded cigarettes, and evidence of below-cost pricing. App. 601–602. Because, as we have explained, this evidence is insufficient as a matter of law to support a finding of primary-line injury under the Robinson-Patman Act, the expert testimony cannot sustain the jury's verdict.

## IV

We understand that the chain of reasoning by which we have concluded that Brown & Williamson is entitled to judgment as a matter of law is demanding. But a reasonable jury is presumed to know and understand the law, the facts of the case, and the realities of the market. We hold that the evidence cannot support a finding that Brown & Williamson's alleged scheme was likely to result in oligopolistic price coordination and sustained supracompetitive pricing in the generic segment of the national cigarette market. Without this, Brown & Williamson had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE BLACKMUN join, dissenting.

For a period of 18 months in 1984 and 1985, respondent Brown & Williamson Tobacco Corporation (B&W) waged a price war against petitioner, known then as Liggett & Myers (Liggett). Liggett filed suit claiming that B&W's pricing practices violated the Robinson-Patman Act.[1] After a 115-

---

[1] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants

day trial, the jury agreed, and awarded Liggett substantial damages. The Court of Appeals, however, found that Liggett could not succeed on its claim, because B&W, as an independent actor controlling only 12% of the national cigarette market, could not injure competition. *Liggett Group, Inc.* v. *Brown & Williamson Tobacco Corp.*, 964 F. 2d 335, 340–342 (CA4 1992).

Today, the Court properly rejects that holding. See *ante*, at 229–230. Instead of remanding the case to the Court of Appeals to resolve the other issues raised by the parties, however, the Court goes on to review portions of the voluminous trial record, and comes to the conclusion that the evidence does not support the jury's finding that B&W's price discrimination "had a reasonable possibility of injuring competition."[2] In my opinion the evidence is plainly sufficient to support that finding.

---

or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ." 15 U. S. C. § 13(a).

[2] The jury gave an affirmative answer to the following special issue:

"1. Did Brown & Williamson engage in price discrimination that had a reasonable possibility of injuring competition in the cigarette market as a whole in the United States?" App. 27.

The jury made its finding after being instructed that "injury to competition" means "the injury to consumer welfare which results when a competitor is able to raise and to maintain prices in a market or well-defined submarket above competitive levels. In order to injure competition in the cigarette market as a whole, Brown & Williamson must be able to create a real possibility of both driving out rivals by loss-creating price cutting and then holding on to that advantage to recoup losses by raising and maintaining prices at higher than competitive levels.

"You must remember that the Robinson-Patman Act was designed to protect competition rather than just competitors and, therefore, injury to competition does not mean injury to a competitor. Liggett & Myers can not satisfy this element simply by showing that they were injured by Brown & Williamson's conduct. To satisfy this element, Liggett & Myers must show, by a preponderance of the evidence, that Brown & Williamson's conduct had a reasonable possibility of injuring competition in the cigarette market and not just a reasonable possibility of injuring a competitor in the cigarette market." *Id.*, at 829–830.

## I

The fact that a price war may not have accomplished its purpose as quickly or as completely as originally intended does not immunize conduct that was illegal when it occurred. A proper understanding of this case therefore requires a brief description of the situation before the war began in July 1984; the events that occurred during the period between July 1984 and the end of 1985; and, finally, the facts bearing on the predictability of competitive harm during or at the end of that period.[3]

### Background

B&W is the third largest firm in a highly concentrated industry. *Ante,* at 213. For decades, the industry has been marked by the same kind of supracompetitive pricing that is characteristic of the textbook monopoly.[4] Without the necessity of actual agreement among the six major manufacturers, "prices for cigarettes increased in lockstep, twice a year, for a number of years, irrespective of the rate of inflation, changes in the costs of production, or shifts in consumer demand." *Ibid.* Notwithstanding the controversy over the health effects of smoking and the increase in the federal excise tax, profit margins improved "handsomely" during the period between 1972 and 1983.[5]

---

[3] As the majority notes, the procedural posture of this case requires that we view the evidence in the light most favorable to Liggett. *Ante,* at 213. On review of a judgment notwithstanding the verdict, the party against whom the judgment is entered "must be given the benefit of every legitimate inference that can be drawn from the evidence." See C. Wright & A. Miller, Federal Practice and Procedure § 2528, pp. 563–564 (1971).

[4] When the Court states that "[s]ubstantial evidence suggests that in recent decades, the industry reaped the benefits of prices above a competitive level," *ante,* at 213, I assume it accepts the proposition that a reasonable jury could find abnormally high prices characteristic of this industry.

[5] An internal B&W memorandum, dated May 15, 1984, states in part:

"Manufacturer's price increases generally were below the rate of inflation but margins improved handsomely due to favorable leaf prices and

The early 1980's brought two new developments to the cigarette market. First, in 1980, when its share of the market had declined to 2.3%, Liggett introduced a new line of generic cigarettes in plain black and white packages, offered at an effective price of approximately 30% less than branded cigarettes. *Ante*, at 214. A B&W memorandum described this action as "the first time that a [cigarette] manufacturer has used pricing as a strategic marketing weapon in the U. S. since the depression era." App. 128. This novel tactic proved successful; by 1984, Liggett's black and whites represented about 4% of the total market and generated substantial profits. The next development came in 1984, when R. J. Reynolds (RJR), the second largest company in the industry, "repositioned" one of its established brands, Doral, by selling it at discount prices comparable to Liggett's black and whites. App. 117–118; *ante*, at 215.

B&W executives prepared a number of internal memoranda planning responses to these two market developments. See App. 120, 127, 157, 166. With respect to RJR, B&W decided to "follo[w] precisely the pathway" of that company, *id.*, at 121, reasoning that "introduction of a branded generic by B&W now appears to be feasible as RJR has the clout and sales force coverage to maintain the price on branded generics," *id.*, at 145. Accordingly, B&W planned to introduce a new "branded generic" of its own, known as Hallmark, to be sold at the same prices as RJR's Doral. *Id.*, at 124, 142–144.

---

cost reductions associated with automation. For example, Brown & Williamson's variable margin increased from $2.91/M in 1972 to $8.78/M in 1981, an increase of over 200%. In 1982, the industry became much more aggressive on the pricing front, fueled by a 100% increase in the Federal Excise Tax. Brown & Williamson's variable margin increased from $10.78/M in 1982 and *[sic]* to $12.61/M in 1983.

"The impact of these pricing activities on the smoking public was dramatic. The weighted average retail price of a pack of cigarettes increased 56% between 1980 and 1983 (from $.63 to $.98)." App. 127.

B&W took a more aggressive approach to Liggett's black and whites. It decided to launch its own line of black and white cigarettes with the "[s]ame style array" and list price as Liggett's, but with "[s]uperior discounts/allowances." *Id.*, at 124. B&W estimated that its own black and whites would generate a "trading profit" of $5.1 million for the second half of 1984 and $43.6 million for 1985. *Id.*, at 125. At the same time, however, B&W, anticipating "competitive counterattacks," was "prepared to redistribute this entire amount in the form of additional trade allowances." *Ibid.* B&W's competitive stance was confined to Liggett; the memorandum outlining B&W's plans made no reference to the possibility of countermoves by RJR, or to the use of B&W's trading profits to increase allowances on any product other than black and whites.

This "dual approach" was designed to "provide B&W more influence to manage up the prices of branded generics to improve profitability," *id.*, at 123, and also the opportunity to participate in the economy market, with a view toward "manag[ing] down generic volume," *id.*, at 109. Notwithstanding its ultimate aim to "limit generic segment growth," *id.*, at 113, B&W estimated an aggregate potential trading profit on black and whites of $342 million for 1984 to 1988, *id.*, at 146. Though B&W recognized that it might be required to use "some or all of this potential trading profit" to maintain its market position, it also believed that it would recoup its losses as the segment became "more profitable, particularly as it approaches maturity." *Ibid.*

B&W began to implement its plan even before it made its first shipment of black and whites in July 1984, with a series of price announcements in June of that year. When B&W announced its first volume discount schedule for distributors, Liggett responded by increasing its own discounts. Though Liggett's discounts remained lower than B&W's, B&W responded in turn by increasing its rebates still further. After four or five moves and countermoves, the dust settled

with B&W's net prices to distributors lower than Liggett's.[6] B&W's deep discounts not only forfeited all of its $48.7 million in projected trading profits for the next 18 months, but actually resulted in sales below B&W's average variable cost. *Id.*, at 338–339.

Assessing the pre-July 1984 evidence tending to prove that B&W was motivated by anticompetitive intent, the District Court observed that the documentary evidence was "more voluminous and detailed than any other reported case. This evidence not only indicates B&W wanted to injure Liggett, it also details an extensive plan to slow the growth of the generic cigarette segment." *Liggett Group, Inc.* v. *Brown & Williamson Tobacco Corp.*, 748 F. Supp. 344, 354 (MDNC 1990).

### The 18-Month Price War

The volume rebates offered by B&W to its wholesalers during the 18-month period from July 1984 to December 1985 unquestionably constituted price discrimination covered by § 2(a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13(a).[7] Nor were the discounts justified by any statutory or affirmative defense: They were not cost justified,[8] App. 525, were

---

[6] On June 4, 1984, B&W announced a maximum rebate of $0.30 per carton for purchases of over 8,000 cases per quarter; a week later, Liggett announced a rebate of $0.20 on comparable volumes. On June 21, B&W increased its rebate to $0.50, and a day later, Liggett went to $0.43. After three more increases, B&W settled at $0.80 per carton, while Liggett remained at $0.73. See App. 327, 420–421.

[7] That quantity discounts are covered by the Act, and prohibited when they have the requisite effect on competition, has been firmly established since our decision in *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 42–44 (1948).

[8] "*Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered." § 13(a).

not good-faith efforts to meet the equally low price of a competitor,[9] and were not mere introductory or promotional discounts, 91 Tr. 42.

The rebate program was intended to harm Liggett and in fact caused it serious injury.[10] The jury found that Liggett had suffered actual damages of $49.6 million, App. 28, an amount close to, but slightly larger than, the $48.7 million trading profit B&W had indicated it would forgo in order to discipline Liggett. See *supra*, at 247. To inflict this injury, B&W sustained a substantial loss. During the full 18-month period, B&W's revenues ran consistently below its total variable costs, with an average deficiency of approximately $0.30 per carton and a total loss on B&W black and whites of almost $15 million. App. 338–339. That B&W executives were willing to accept losses of this magnitude during the entire 18 months is powerful evidence of their belief that prices ultimately could be "managed up" to a level that would allow B&W to recoup its investment.

### The Aftermath

At the end of 1985, the list price of branded cigarettes was $33.15 per carton, and the list price of black and whites, $19.75 per carton. App. 325. Over the next four years, the list price on both branded and black and white cigarettes

---

[9] *"Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." § 13(b).

The jury gave a negative answer to the following special issue:

"3. Did Brown & Williamson engage in price discrimination in good faith with the intention to meet, but not beat, the equally low net prices of Liggett Group, Inc.?" App. 27–28.

[10] By offering its largest discounts to Liggett's 14 largest customers, App. 168–169, 174, B&W not only put its "money where the volume is," *id.*, at 402, but also applied maximum pressure to Liggett at a lesser cost to itself than would have resulted from a nondiscriminatory price cut.

increased twice a year, by identical amounts. The June 1989 increases brought the price of branded cigarettes to $46.15 per carton, and the price of black and whites to $33.75—an amount even higher than the price for branded cigarettes when the war ended in December 1985. *Ibid.*[11] Because the rate of increase was higher on black and whites than on brandeds, the price differential between the two types of cigarettes narrowed, *ibid.*, from roughly 40% in 1985 to 27% in 1989. See 964 F. 2d, at 338.

The expert economist employed by Liggett testified that the post-1985 price increases were unwarranted by increases in manufacturing or other costs, taxes, or promotional expenditures. App. 525. To be sure, some portion of the volume rebates granted distributors was passed on to consumers in the form of promotional activity, so that consumers did not feel the full brunt of the price increases. Nevertheless, the record amply supports the conclusion that the post-1985 price increases in list prices produced higher consumer prices, as well as higher profits for the manufacturers.[12]

The legal question presented by this evidence is whether the facts as they existed during and at the close of the 18-month period, and all reasonable inferences to be drawn from

---

[11] It is also true that these same years, other major manufacturers entered the generic market and expanded their generic sales. *Ante*, at 217. Their entry is entirely consistent with the possibility that lockstep increases in the price of generics brought them to a level that was supracompetitive, though lower than that charged on branded cigarettes.

[12] "Q Does this mean that the price increases, which you testified are happening twice a year, are used up in these consumer promotions?

"A Not by any stretch of the imagination. Although there has been an increase in the use of this type of promotional activity over the last four or five years, the increase in that promotional activity has been far outstripped by the list price increases. The prices go up by a lot; the promotional activity, indeed, does go up. But the promotional activity has not gone up by anywhere near the magnitude of the list price increases. Further, those price increases are not warranted by increasing costs, since the manufacturing costs of making cigarettes have remained roughly constant over the last five years." App. 509.

those facts, see n. 3, *supra,* justified the finding by the jury that B&W's discriminatory pricing campaign "had a reasonable possibility of injuring competition," see *supra,* at 244, and n. 2.

## II

The Sherman Act, 26 Stat. 209, enacted in 1890, the Clayton Act, 38 Stat. 730, enacted in 1914, and the Robinson-Patman Act, which amended the Clayton Act in 1936, all serve the purpose of protecting competition. Because they have a common goal, the statutes are similar in many respects. All three prohibit the predatory practice of deliberately selling below cost to discipline a competitor, either to drive the competitor out of business or to raise prices to a level that will enable the predator to recover its losses and, in the long run, earn additional profits. Sales below cost and anticompetitive intent are elements of the violation of all three statutes. Neither of those elements, however, is at issue in this case. See *ante,* at 231 (record contains sufficient evidence of anticompetitive intent and below-cost pricing).

The statutes do differ significantly with respect to one element of the violation, the competitive consequences of predatory conduct. Even here, however, the three statutes have one thing in common: Not one of them requires proof that a predatory plan has actually succeeded in accomplishing its objective. Section 1 of the Sherman Act requires proof of a conspiracy. It is the joint plan to restrain trade, however, and not its success, that is prohibited by § 1. *Nash* v. *United States,* 229 U. S. 373, 378 (1913). Section 2 of the Sherman Act applies to independent conduct, and may be violated when there is a "dangerous probability" that an attempt to achieve monopoly power will succeed. *Swift & Co.* v. *United States,* 196 U. S. 375, 396 (1905). The Clayton Act goes beyond the "dangerous probability" standard to cover price discrimination "where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce." § 2, 38 Stat. 730.

252

The element of competitive injury as defined in the Robinson-Patman Act is broader still.[13]   See S. Rep. No. 1502, 74th Cong., 2d Sess., 4 (1936) (Act substantially broadens similar clause of Clayton Act).[14]   The Robinson-Patman Act was designed to reach discriminations "in their incipiency, before the harm to competition is effected.   It is enough that they 'may' have the prescribed effect."   *Corn Products Refining Co.* v. *FTC*, 324 U. S. 726, 738 (1945) (internal quotation marks omitted).   Or, as the Report of the Senate Judiciary Committee on the proposed Act explained, "to catch the weed in the seed will keep it from coming to flower."   S. Rep. No. 1502, at 4.

Accordingly, our leading case concerning discriminatory volume rebates described the scope of the Act as follows:

---

[13] See text of statute, n. 1, *supra.*

[14] One of the purposes of broadening the Clayton Act's competitive injury language in the Robinson-Patman Act was to provide more effective protection against predatory price cutting.   As the Attorney General's National Committee to Study the Antitrust Laws explained in its 1955 report:

"In some circumstances, to be sure, injury to even a single competitor should bring the Act into play.   Predatory price cutting designed to eliminate a smaller business rival, for example, is a practice which inevitably frustrates competition by excluding competitors from the market or deliberately impairing their competitive strength.   The invalidation of such deliberate price slashes for the purpose of destroying even a single competitor, moreover, accords distinct recognition to the narrower tests of 'injury' added to the price discrimination provisions of the Clayton Act through the 1936 Robinson-Patman amendments.   The discrimination provisions in the original Clayton Act were feared by the legislators as inadequate to check the victimization of individual businessmen by predatory price cuts that nevertheless created no *general* impairment of competitive conditions in a wider market.   To reach such destructive price cuts endangering the survival of smaller rivals of a powerful seller was an express objective of the liberalizing amendments in the 'injury' clause of the Robinson-Patman Act."   Report of the Attorney General's National Committee to Study the Antitrust Laws 165–166 (1955) (footnotes omitted).

"There are specific findings that such injuries had resulted from respondent's discounts, although the statute does not require the Commission to find that injury has actually resulted. The statute requires no more than that the effect of the prohibited price discriminations 'may be substantially to lessen competition . . . or to injure, destroy, or prevent competition.' After a careful consideration of this provision of the Robinson-Patman Act, we have said that 'the statute does not require that the discrimination must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect.' *Corn Products Co.* v. *Federal Trade Comm'n*, 324 U. S. 726, 742." *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 46 (1948).

See also *Falls City Industries, Inc.* v. *Vanco Beverage, Inc.*, 460 U. S. 428, 435 (1983) ("In keeping with the Robinson-Patman Act's prophylactic purpose, § 2(a) does not require that the discriminations must in fact have harmed competition" (internal quotation marks omitted)).

In this case, then, Liggett need not show any actual harm to competition, but only the reasonable possibility that such harm would flow from B&W's conduct. The evidence presented supports the conclusion that B&W's price war was intended to discipline Liggett for its unprecedented use of price competition in an industry that had enjoyed handsome supracompetitive profits for about half a century. The evidence also demonstrates that B&W executives were confident enough in the feasibility of their plan that they were willing to invest millions of company dollars in its outcome. And all of this, of course, must be viewed against a background of supracompetitive, parallel pricing, in which "prices for cigarettes increased in lockstep, twice a year . . . irrespective of the rate of inflation, changes in the cost of production, or shifts in consumer demand," *ante*, at 213, bringing with them dramatic increases in profit margins, see n. 5, *supra*. In this context, it is surely fair to infer that B&W's discipli-

nary program had a reasonable prospect of persuading Liggett to forgo its maverick price reductions and return to parallel pricing policies, and thus to restore the same kind of supracompetitive pricing that had characterized the industry in the past. When the facts are viewed in the light most favorable to Liggett, I think it clear that there is sufficient evidence in the record that the "reasonable possibility" of competitive injury required by the statute actually existed.

### III

After 115 days of trial, during which it considered 2,884 exhibits, 85 deposition excerpts, and testimony from 23 live witnesses, the jury deliberated for nine days and then returned a verdict finding that B&W engaged in price discrimination with a "reasonable possibility of injuring competition." 748 F. Supp., at 348, n. 4; n. 2, *supra*. The Court's contrary conclusion rests on a hodgepodge of legal, factual, and economic propositions that are insufficient, alone or together, to overcome the jury's assessment of the evidence.

First, as a matter of law, the Court reminds us that the Robinson-Patman Act is concerned with consumer welfare and competition, as opposed to protecting individual competitors from harm; "the antitrust laws were passed for the protection of competition, not competitors." See *ante*, at 224 (internal quotations marks and emphasis omitted). For that reason, predatory price cutting is not unlawful unless the predator has a reasonable prospect of recouping his investment from supracompetitive profits. *Ibid.* The jury, of course, was so instructed, see n. 2, *supra*, and no one questions that proposition here.

As a matter of fact, the Court emphasizes the growth in the generic segment following B&W's entry. As the Court notes, generics' expansion to over 12% of the total market by 1988 exceeds B&W's own forecast that the segment would grow to only about 10%, assuming no entry by B&W. *Ante*, at 234. What these figures do not do, however, is answer the

relevant question: whether the prices of generic cigarettes during the late 1980's were competitive or supracompetitive.

On this point, there is ample, uncontradicted evidence that the list prices on generic cigarettes, as well as the prices on branded cigarettes, rose regularly and significantly during the late 1980's, in a fashion remarkably similar to the price change patterns that characterized the industry in the 1970's when supracompetitive, oligopolistic pricing admittedly prevailed. See *supra*, at 245; *ante*, at 213. Given its knowledge of the industry's history of parallel pricing, I think the jury plainly was entitled to draw an inference that these increased prices were supracompetitive.

The Court responds to this evidence dismissively, suggesting that list prices have no bearing on the question because promotional activities of the cigarette manufacturers may have offset such price increases. *Ante*, at 235–236. That response is insufficient for three reasons. First, the promotions to which the majority refers related primarily to branded cigarettes; accordingly, while they narrowed the differential between branded prices and black and white prices, they did not reduce the consumer price of black and whites. See 33 Tr. 208–210. Second, the Court's speculation is inconsistent with record evidence that the semiannual list price increases were not offset by consumer promotions. See n. 12, *supra*. See also *ante*, at 218 ("at least some portion of the list price increase was reflected in a higher net price to the consumer"). Finally, to the extent there is a dispute regarding the effect of promotional activities on consumer prices for generics, the jury presumably resolved that dispute in Liggett's favor, and the Court's contrary speculation is an insufficient basis for setting aside that verdict.[15]

---

[15] In finding an absence of actual supracompetitive pricing, the Court also relies on the testimony of Liggett executives, who stated that industry prices were fair. Illustrative is the following exchange:

"Q I want to know—yes or no—sir, whether or not you say that the price you charged for branded cigarettes, which is the same price you say

As a matter of economics, the Court reminds us that price cutting is generally procompetitive, and hence a "boon to consumers." *Ante,* at 224. This is true, however, only so long as reduced prices do not fall below cost, as the cases cited by the majority make clear.[16] When a predator deliberately engages in below-cost pricing targeted at a particular competitor over a sustained period of time, then price cutting raises a credible inference that harm to compe-

---

everybody else charged, was a fair and equitable price for that product to the American consumer.

"A It's what the industry set, and based on that it's a fair price." App. 396.

The problem with this testimony, and testimony like it, is that it relates to the period before the price war, as well as after, see *id.,* at 392, when there is no real dispute but that prices were supracompetitive. ("[T]he profits in the cigarette industry are the best of any industry I've been associated with, very much so." *Ibid.*) Some of the testimony cited by the Court, for instance, is that of an outside director who served only from 1977 or 1978 until 1980, see 64 Tr. 51–56, cited *ante,* at 237; his belief in the competitiveness of his industry must be viewed against the "[s]ubstantial evidence suggest[ing] that in recent decades, the industry reaped the benefits of prices above a competitive level" to which the majority itself refers, *ante,* at 213.

The jury was, of course, entitled to discount the probative force of testimony from executives to the effect that there was no collusion among tobacco manufacturers, App. 397–398, and that they had appeared before a congressional committee to vouch for the competitive nature of their industry, *id.,* at 623–631. The jury was also free to give greater weight to the documentary evidence presented, the inferences to be drawn therefrom, and the testimony of experts who agreed with the textbook characterization of the industry. See App. 640–645; R. Tennant, American Cigarette Industry 342 (1950).

[16] In *Atlantic Richfield Co.* v. *USA Petroleum Co.,* 495 U. S. 328, 339–340 (1990), for example, we noted that low prices benefit consumers "so long as they are above predatory levels." In *Cargill, Inc.* v. *Monfort of Colorado, Inc.,* 479 U. S. 104, 118 (1986), we recognized that price cutting of a predatory nature is "inimical" to competition, and limited our approving comments to pricing that is "above some measure of incremental costs." *Id.,* at 117–118, and n. 12 (internal quotation marks omitted).

tition is likely to ensue.[17]   None of our cases disputes that proposition.

Also as a matter of economics, the Court insists that a predatory pricing program in an oligopoly is unlikely to succeed absent actual conspiracy.   Though it has rejected a somewhat stronger version of this proposition as a rule of decision, see *ante*, at 229–230, the Court comes back to the same economic theory, relying on the supposition that an "anticompetitive minuet is most difficult to compose and to perform, even for a disciplined oligopoly," *ante*, at 228.   See *ante*, at 238–243 (implausibility of tacit coordination among cigarette oligopolists in 1980's).   I would suppose, however, that the professional performers who had danced the minuet for 40 to 50 years would be better able to predict whether their favorite partners would follow them in the future than would an outsider, who might not know the difference between Haydn and Mozart.[18]   In any event, the jury was

---

[17] *Utah Pie Co.* v. *Continental Baking Co.*, 386 U. S. 685, 696–698, and n. 12 (1967).   See also *Lomar Wholesale Grocery, Inc.* v. *Dieter's Gourmet Foods, Inc.*, 824 F. 2d 582, 596 (CA8 1987) (threat to competition may be shown by predatory intent, combined with injury to competitor), cert. denied, 484 U. S. 1010 (1988); *Double H Plastics, Inc.* v. *Sonoco Products Co.*, 732 F. 2d 351, 354 (CA3) (threat to competition may be shown by evidence of predatory intent, in form of below-cost pricing), cert. denied, 469 U. S. 900 (1984); *D. E. Rogers Associates, Inc.* v. *Gardner-Denver Co.*, 718 F. 2d 1431, 1439 (CA6 1983) (anticompetitive effect may be proven inferentially from anticompetitive intent), cert. denied, 467 U. S. 1242 (1984).   See generally *Board of Trade of Chicago* v. *United States*, 246 U. S. 231, 238 (1918) (in determining whether rule violates antitrust law, "knowledge of intent may help the court to interpret facts and to predict consequences").

[18] Judge Easterbrook has made the same point:

"Wisdom lags far behind the market

.        .        .        .        .

"[L]awyers know less about the business than the people they represent . . . .   The judge knows even less about the business than the lawyers."   Easterbrook, The Limits of Antitrust, 63 Texas L. Rev. 1, 5 (1984).

surely entitled to infer that at the time of the price war itself, B&W reasonably believed that it could signal its intentions to its fellow oligopolists, see App. 61, assuring their continued cooperation.

Perhaps the Court's most significant error is the assumption that seems to pervade much of the final sections of its opinion: that Liggett had the burden of proving either the actuality of supracompetitive pricing, or the actuality of tacit collusion. See *ante*, at 233–237 (finding absence of actual supracompetitive pricing), 238–243 (finding absence of evidence suggesting actual coordination). In my opinion, the jury was entitled to infer from the succession of price increases after 1985—when the prices for branded and generic cigarettes increased every six months from $33.15 and $19.75, respectively, to $46.15 and $33.75—that B&W's below-cost pricing actually produced supracompetitive prices, with the help of tacit collusion among the players. See *supra*, at 255. But even if that were not so clear, the jury would surely be entitled to infer that B&W's predatory plan, in which it invested millions of dollars for the purpose of achieving an admittedly anticompetitive result, carried a "reasonable possibility" of injuring competition.

Accordingly, I respectfully dissent.