**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1871
_____

PHILADELPHIA TAXI ASSOCIATION, INC; AAMIR
TRANS., INC.; AANYIA TRANS., INC.; ABAAS TRANS.,
INC.; ABNIK INC.; AMRAAN TRANS., INC.; ATMA CAB
INC.; AUMBREEN; AVINITH BROTHERS CORP.; BAINS
TRANSPORTATION, INC.;BALAN CAB CO.; BAM ARG
INC.; BILLA CAB CO.; B&M TRANSPORT INC.;
CHAUDHRY CAB INC.; C.S. CAB CO.; DASHMESH
CAB CORP.; DAYA ENTERPRISES INC.; DAYA
TRANSPORTATION INC.; DHAMTHAL TRANS INC.;
DHESI CAB CO.; E&S TRANS INC.;
GOLDEN TEMPLE CORP.; GURU CAB CO.; GURU
TRANS., INC.; GURVEER CAB CO.; HARRY DILLION
CAB CO.; H BHATTI; H&J CAB CO.; HSP CAB CO.;
INDER TRANSPORT INC.; I&S, MAGASSA INC.; JAI
LUXMI INC.; JEN-KHO TRANS.; JFK TRANSIT INC.;
JRK CAB CO.; J.K.P. TRANSPORT, INC.;
J&H CAB CO.; KAMAL D INC.; KASHIF CORP.;
KEJSI & AU LONA CAB CO.; KHADIM TRANS INC.;
KHAYYAM INC.; KHKHOAR TAXI CAB; KHOKHA
GROUP USA; KM TAXI, INC.; K SINGH CAB, INC.;
MAHER CAB CO.; MANNA S. INC.; M&M TRANS INC.;
NASRIN TRANS INC.; NAVID INC.; NAVJOT CAB
COMPANY; NJJAR CAB CO.; ONE CAB INC.;
PARVEEN TRANSPORT INC.; PRABH INC.; PUN JAB

CORP.; P.K. CAB; RAJA CAB CO.; RAJDEEP CAB INC.;
RAMTIN INC.; RASUL CORP.; SAAS CAB CO.;
SAHOTA CAB CO.; SANAZ, INC.;
SARDAR CAB CO.; SETAREH CAB CO.; SHAAD CAB
INC.; SHAWN LIMO; SHIVAM CAB CORP.; SINGH
MAAN INC.; T.S. MALHI CAB CO.; ZADEH INC.; ZAHD
TRANS INC.; ZARI CAB CO.; PANTHEA, INC.; PARS
TRANSPORT, INC.; CITY CAR TRANSPORT, INC.;
PHILA TRANSPORT, INC.,
Appellants

v.

UBER TECHNOLOGIES, INC.

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 2-16-cv-1207)
District Judge: Honorable Juan R. Sánchez

---

Argued November 14, 2017

Before: AMBRO, KRAUSE, and RENDELL, *Circuit Judges*

(Opinion Filed:  March 27, 2018)

John F. Innelli                [ARGUED]
Two Penn Center
Suite 1300
Philadelphia, PA 19102

Stephen R. Bolden
Fell & Spalding
100 South Broad Street
2230 Land Title Building
Philadelphia, PA 19110
        *Counsel for Appellants*

Steven A. Reed                 [ARGUED]
R. Brendan Fee
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Brian C. Rocca
Sujal J. Shah
Morgan Lewis & Bockius
One Market, Spear Street Tower
San Francisco, CA 94105
        *Counsel for Appellee*

———————

O P I N I O N

———————

RENDELL, *Circuit Judge*:

Philadelphia taxicab drivers, aggrieved by the influx of taxis hailed at the touch of an app on one's phone, brought this antitrust action to protest the entry of Appellee Uber Technologies, Inc. ("Uber") into the Philadelphia taxicab

3

market. The Philadelphia Taxi Association ("PTA"), along with 80 individual taxicab companies (collectively, "Appellants"), appeal the District Court's dismissal of their Second Amended Complaint ("SAC") alleging one count of attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, and seeking injunctive relief and treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

Appellants urge us to reverse the District Court's Order, contending that Uber violated the antitrust laws because its entry into the Philadelphia taxicab market was illegal, predatory, and led to a sharp drop in the value of taxicab medallions as well as a loss of profits. They contend that this is evidence that Uber's operation in Philadelphia was anticompetitive and caused them to suffer an antitrust injury. However, the conduct they allege falls short of the conduct that would constitute an attempted monopoly in contravention of the antitrust laws. Thus, we will affirm the District Court's dismissal of the SAC for failure to state a claim for attempted monopolization and failure to state an antitrust injury.

I. Background & Procedural History[1]

From March of 2005 to October of 2014, taxicabs operating in Philadelphia were required to have a medallion and a certificate of public convenience, issued by the Philadelphia Parking Authority ("PPA"). Medallions are property, and are often pledged as collateral to borrow funds to finance the purchase of the cab or to "upgrade and improve

---

[1] As this appeal arises from the grant of a motion to dismiss, the factual allegations set forth below are taken from the SAC and are accepted as true. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 642 n.1 (2008).

the operations of taxicabs." 53 Pa. C.S.A. § 5712(a). Once medallion-holders comply with the obligatory standards for taxicabs, they may obtain a certificate of public convenience. Those standards, which provide for safety and uniformity among taxicabs, require vehicles to be insured and in proper condition, and mandate that drivers are paid the prevailing minimum wage, are proficient in English, and have the appropriate drivers' licenses.

As alleged in the SAC, when the medallion system was mandated in Philadelphia in 2005, a medallion was worth only $65,000. In October of 2014, there were approximately 500 taxicab companies in Philadelphia. Together, 7,000 drivers held 1610 medallions, each valued at an average of $545,000.

Appellants are 80 of those 500 companies, which collectively hold 240 of the 1610 medallions, as well as PTA, which was incorporated to advance the legal interests of its members—the 80 individual medallion taxicab companies.

Uber began operating in Philadelphia in October of 2014 without securing medallions or certificates of public convenience for its vehicles. While a potential rider can avail himself of a medallion taxicab by calling a dispatcher or hailing an available cab, to use Uber, he can download the Uber application onto his mobile phone and request that the vehicle come to his location, wherever he is. Passengers enter payment information, which is retained by Uber and automatically processed at the end of each ride. Uber does not own or assume legal responsibility for the vehicles or their

5

operation, nor does it hire the drivers as its employees.[2] Uber did not pay fines to the PPA or comply with its regulations when it first entered the Philadelphia taxi market, as is otherwise required for medallion taxicabs. Appellants maintain that this rendered Uber's operation illegal, and enabled the company to cut operating costs considerably.

In October of 2016, the Pennsylvania state legislature passed a law approving Uber's operation in Philadelphia, under the authority of the PPA. The law, which went into effect in November of 2016, allows the PPA to regulate both medallion taxicab companies and Transportation Network Companies ("TNCs")—a classification that includes Uber and other vehicle-for-hire companies that operate through digital apps—in Philadelphia. TNCs must now obtain licenses to operate and comply with certain requirements, including insurance obligations and safety standards for drivers and vehicles. The law also exempts TNCs from disclosing the number of drivers or vehicles operating in the city, and allows TNCs to set their own fares, unlike medallion taxicab companies, which comply with established rates, minimum wages, and have a limited number of vehicles and medallions operating at once in Philadelphia.

Before this law passed, in Uber's first two years in Philadelphia, nearly 1200 medallion taxicab drivers left their respective companies and began to drive for Uber. In those

---

[2] We are aware that the issue of whether drivers can be classified as employees or independent contractors is the subject of ongoing litigation. *See, e.g.*, *Razak v. Uber Techs., Inc.*, No. 16-cv-573, 2017 WL 4052417 (E.D. Pa. Sept. 13, 2017).

two years, there were 1700 Uber drivers and vehicles operating in Philadelphia, serving over 700,000 riders, for more than one million trips. Simultaneously, medallion taxi rides reduced by about 30 percent, and thus Appellants experienced a 30 percent decrease in earnings. The value of each medallion dropped significantly, to approximately $80,000 in November of 2016. Fifteen percent of medallions have been confiscated by the lenders due to default by drivers.

The PTA and 75 individual taxicab companies filed a Complaint, alleging three counts: attempted monopolization under Section 2 of the Sherman Act, tortious interference with contract under Pennsylvania law, and unfair competition under Pennsylvania law. Uber moved to dismiss the Complaint.

Appellants, the PTA and now 80 individual taxicab companies, then filed an Amended Complaint, alleging the same three counts. Uber moved to dismiss the Amended Complaint. The District Court granted the dismissal, without prejudice. The District Court noted that Plaintiffs alleged merely harm to their business after Uber entered the Philadelphia taxicab market, and that Plaintiffs pointed to Uber's supposed illegal participation in the taxicab market as evidence of attempted monopolization. However, the District Court concluded that these harms are "not the type of injuries that antitrust laws were intended to prevent, and thus do not establish antitrust standing." *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 218 F. Supp. 3d 389, 392 (E.D. Pa. 2016). The Court also dismissed the state law claims, for failure to plead the proper elements of an unfair competition or a tortious interference claim.

7

Appellants then filed the SAC, alleging one count of attempted monopolization under Section 2 of the Sherman Act and seeking treble damages under Section 4 of the Clayton Act. Uber responded with a Motion to Dismiss, which the District Court granted, with prejudice. *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 2017 WL 5515953 (E.D. Pa. Mar. 20, 2017). The District Court held that Appellants, in spite of multiple opportunities for amendment, had pled no antitrust injury sufficient for antitrust standing, and were unlikely to cure the lack of standing with any amendments to the SAC. The Court also held that the PTA could not satisfy the requirements for associational standing because the association's members lacked standing to sue on their own.

## II. Standard of Review

The District Court had jurisdiction over the Sherman Act claim pursuant to 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 4.  We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review of the District Court's dismissal of the SAC, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017), and may affirm the judgment below on any basis that is supported by the record. *Murray v. Bledsoe*, 650 F.3d 246, 247 (3d Cir. 2011). We accept as true the factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 91 (3d Cir. 2010).

## III. Discussion

Competition is at the heart of the antitrust laws; it is only anticompetitive conduct, or "a competition-

8

*reducing* aspect or effect of the defendant's behavior," that antitrust laws seek to curtail. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). "[I]t is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 (1986) (alternations and internal quotation marks omitted). This comports with the principle underlying antitrust laws: to protect *competition*, not *competitors*. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

If the challenged conduct has an effect on "prices, quantity or quality of goods or services," *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996), we will find a violation of antitrust laws only when that effect harms the market, and thereby harms the consumer.

Anticompetitive conduct is the hallmark of an antitrust claim. An allegation of anticompetitive conduct is necessary both to: (1) state a claim for attempted monopolization; and (2) aver that a private plaintiff has suffered an antitrust injury. Appellants' SAC, however, is deficient in averring conduct that is, in fact, anticompetitive.

While our caselaw is unresolved regarding which to address first—an antitrust violation or an antitrust injury[3]—

---

[3] *Compare, e.g.*, *Matthews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639–41 (3d Cir. 1996) (first holding that plaintiff had failed to state a claim for attempted monopolization, and then concluding that plaintiff had also failed to allege an antitrust injury), *with, e.g.*, *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 274 (3d Cir. 1999) (assuming the allegation of

9

we need not resolve that here, because Appellants' claim fails on both counts. We begin by discussing how Appellants' allegations in the SAC fall short of demonstrating anticompetitive conduct, and thus fail to state a claim for attempted monopolization,[4] and then discuss how in the alternative, Appellants fail to allege antitrust injury to have antitrust standing. For both reasons, we affirm the judgment of the District Court dismissing the SAC with prejudice.

A. Attempted Monopolization

To prevail on a claim under Sherman Act Section 2 for attempted monopolization, a plaintiff must prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421,

---

defendant's anticompetitive motive and then concluding that the plaintiff had adequately alleged an antitrust injury).

[4] Because the District Court found that Appellants had not alleged an antitrust injury to have standing, the Court did not reach the underlying attempted monopolization claim. Appellants nevertheless raised the issue on appeal, and because we may affirm the dismissal of the SAC on any basis that is supported by the record, *Murray*, 650 F.3d at 247, we will address this issue.

433 (3d Cir. 2016) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007)). Moreover, to survive a motion to dismiss under Rule 12(b)(6), the claim must be "plausible on its face," allowing us to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions that resulted in a dangerous probability of achieving monopoly power. *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 393 (3d Cir. 2016).

In the SAC, Appellants allege that Uber: (1) flooded the market with non-medallion taxicabs, entered the market illegally without purchasing medallions, operated at a lower cost by failing to comply with statutory requirements and regulations, and lured away drivers from Individual Plaintiffs, which allegedly impaired the competitive market for medallion taxicabs; (2) knew of PPA's regulatory jurisdiction over vehicles for hire, purposefully ignored or avoided the regulations and rulings of the Court of Common Pleas, and thereby excluded rivals from competing in the taxicab market; and (3) is dangerously close to achieving monopoly power with its market share and by operating in an unfair playing field with the "financial ability" to be the only market player and to destroy competitors' business. SAC ¶ 83. Appellants also complain that the new legislation authorizing the TNCs' operation would facilitate the creation of an illegal monopoly.

We find that the SAC fails to plausibly allege any of the three elements of an attempted monopolization claim.

11

## 1. Anticompetitive Conduct

Allegations of purportedly anticompetitive conduct are meritless if those acts would cause no deleterious effect on competition. This is where the SAC falters: Appellants set forth a litany of ways in which Uber's entry into the market has harmed Appellants' business and their investment in medallions; yet none of the allegations demonstrate a harmful effect on competition.

To determine whether conduct is anticompetitive, "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc).

Here, Appellants claim that Uber inundated the Philadelphia taxicab market illegally with their non-medallion vehicles. They contend that Uber's entry into the market was predatory because it failed to comply with statutory and regulatory requirements, failed to purchase medallions, failed to pay drivers a minimum wage, and failed to obtain the proper insurance, among other actions. All of these actions, Appellants assert, enabled Uber to operate at a significantly lower cost than the medallion companies, and thereby acquire a stronghold in the Philadelphia taxicab market.

Appellants also maintain that Uber "flooded" the Philadelphia taxicab market by improperly luring drivers away from medallion companies, including Individual Plaintiffs. Appellants cite Uber's practice of sending representatives to 30th Street Station and the Philadelphia

12

International Airport, where medallion taxicab drivers often congregate, to disseminate information about its services and to recruit potential drivers. They argue that Uber promised new drivers financial inducements, such as reimbursements for the cost of gasoline, as an incentive to leave their medallion companies and instead drive for Uber.

Considering the averments regarding Uber's conduct in their totality, Uber's elimination of medallion taxicab competition did not constitute anticompetitive conduct violative of the antitrust laws.

First, inundating the Philadelphia taxicab market with Uber vehicles, even if it served to eliminate competitors, was not *anticompetitive*. Rather, this bolstered competition by offering customers lower prices, more available taxicabs, and a high-tech alternative to the customary method of hailing taxicabs and paying for rides. It is well established that lower prices, as long as they are not predatory, [5] benefit consumers—"regardless of how those prices are set." *Atl. Richfield*, 495 U.S. at 340. "Cutting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592 (1986). Thus, lost business alone cannot be deemed a

---

[5] To allege predatory pricing, a plaintiff must first demonstrate that prices are set below costs, and that the competitor had a dangerous probability of recouping those lost profits after it had driven other competitors out of the market. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993). Appellants have not alleged predatory pricing in this case.

consequence of "anticompetitive" acts by the defendant. *See Atl. Richfield*, 495 U.S. at 337.

Second, Uber's ability to operate at a lower cost is not anticompetitive. Running a business with greater economic efficiency is to be encouraged, because that often translates to enhanced competition among market players, better products, and lower prices for consumers. Even if Uber were able to cut costs by allegedly violating PPA regulations, Appellants cannot use the antitrust laws to hold Uber liable for these violations absent proof of anticompetitive conduct. Even unlawful conduct is "of no concern to the antitrust laws" unless it produces an anticompetitive effect. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977).

Finally, hiring rivals may be anticompetitive, but only in certain cases. For example, if rival employees were hired in an attempt to exclude competitors from the market for some basis other than efficiency or merit, such as to acquire monopoly power or to merely deny the employees to the rival, this could violate the antitrust laws if injurious to the rival and to competition at large. *W. Penn*, 627 F.3d at 109 (citing cases).

However, Appellants acknowledge that the nearly 1200 medallion taxicab drivers that Uber recruited did not remain idle, but rather they drove for Uber. In sum, what Appellants allege does not give rise to an inference of anticompetitive or exclusionary conduct and suggests, if anything, that Uber's ability to attract these drivers was due to its cost efficiency and competitive advantage.

Thus, the SAC is devoid of allegations of truly anticompetitive conduct.

14

## 2. Specific Intent to Monopolize

Appellants allege specific intent to monopolize from Uber's knowledge that the PPA maintained regulatory authority over vehicles-for-hire, and its choice to avoid regulation by being a TNC that neither owned vehicles nor employed drivers. They also point to Uber's alleged willful disregard of the rulings of the Court of Common Pleas. Appellants' claim, in essence, is that Uber's knowledge that their operation was illegal reveals a specific intent to monopolize.

"[I]n a traditional § 2 claim, a plaintiff would have to point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize." *Avaya*, 838 F.3d at 406 (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

Some courts have inferred specific intent from anticompetitive or exclusionary conduct, *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995), for instance, when business conduct is "not related to any apparent efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39 (1985) (quoting R. Bork, *The Antitrust Paradox* 157 (1978)) (alterations omitted); *see also* 4 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 805d, (4th ed. 2017) (discussing how some courts "would find for the plaintiff only if the defendant's acts were not motivated by 'reasonable' or 'legitimate' business purposes").

15

While Uber's alleged conduct might have formed the basis of a regulatory violation, its knowledge of existing regulations alone cannot reasonably be said to demonstrate specific intent to monopolize. Further, Uber's choice to distinguish itself from other vehicles-for-hire, eschewing medallions in favor of independent drivers who operate their own cars at will, can instead be reasonably viewed as "predominantly motivated by legitimate business aims." *Times Picayune Publ'g Co. v. United States*, 345 U.S. 594, 627 (1953). Appellants have not averred any other motive. The allegations suggest that these business choices allowed Uber to operate more efficiently, and to offer a service that consumers find attractive, thus enabling it to acquire a share of the Philadelphia taxicab market.

Thus, Uber's alleged competitive strategy of creating a vehicle-for-hire business model, presumably to acquire customers, does not reflect specific intent to monopolize. Accordingly, Appellants have failed to allege specific intent on Uber's part.

### 3. Dangerous Probability of Achieving Monopoly Power

We held in *Broadcom Corp. v. Qualcomm Inc.* that because the dangerous probability standard is a complex and "fact-intensive" inquiry, courts "typically should not resolve this question at the pleading stage 'unless it is clear on the face of the complaint that the "dangerous probability" standard cannot be met as a matter of law.'" 501 F.3d at 318–

16

19 (quoting *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3d Cir.1995)).

We may consider factors such as "significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand" to determine whether dangerous probability was alleged in the pleadings. *Id.* Entry barriers include "regulatory requirements, high capital costs, or technological obstacles[] that prevent new competition from entering a market." *Id.* at 307 (citations omitted). "No single factor is dispositive." *Id.* at 318.

Appellants argue that Uber has a dangerous probability of achieving monopoly power because it has pushed numerous competitors out of the market. As discussed, however, the SAC fails to allege anticompetitive practices by Uber. Nor does the SAC mention Uber's market share; it merely suggests that Uber and medallion taxicabs had similar numbers of vehicles operating in Philadelphia as of October 2016. This allegation falls short of indicating Uber's market share in the context of *all* the competitors in the Philadelphia taxicab market, such as other TNCs.

Similarly, the SAC makes no allegation of current barriers to entry or weak competition from other market participants. Appellants make the bold allegation that Uber holds the *power* to raise barriers to entry in the market, without any factual support. In fact, the SAC alleges that Uber was readily able to enter the Philadelphia market. "[E]asy entry—particularly historical evidence of entry—is even more significant in the attempt case than in monopolization cases generally." Areeda & Hovenkamp, ¶

17

807a.[6] Surely other competitors, such as Lyft, are able to enter without difficulty, as well.

Nor does the SAC describe any potentially harmful industry developments. It only vaguely claims that Uber may be able to drive out competition and raise entry barriers. Appellants assert in the SAC that once Uber becomes the dominant competitor, it *would be able to* charge higher prices, and consumers who do not own smartphones would be deprived of the ability to hail taxis on the street. Absent any allegations of a dangerous probability of achieving monopoly power, this argument fails. And, as counsel for Uber stated at oral argument, if Uber raised its prices, this would encourage other rivals to enter the market and charge lower prices, battling Uber through price competition.

Because the elements of attempted monopolization are often interdependent, proof of one element may provide "permissible inferences" of other elements. *Broadcom*, 501 F.3d at 318 (quoting *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir.1992)). Even so, none of the other elements of attempted monopolization allow us to infer a dangerous probability that Uber will achieve monopoly

---

[6] Areeda and Hovenkamp explain that in an attempt case, when "the defendant is not yet a monopolist," market prices are more competitive. ¶ 807g. On the other hand, "[i]n a monopolization case the defendant is already a dominant firm and the market already presumably exhibits monopoly prices that have not been effectively disciplined by new entry." *Id.* Thus, easy entry into the market is indicative that the market lacks barriers to entry that may otherwise protect a dominant firm's monopoly power. *Id.*

18

power. Acknowledging *Broadcom*'s reticence to resolve the dangerous probability question at the pleadings stage, we nevertheless find that the SAC does not allege any of the relevant factors to prove that Uber had a dangerous probability of achieving monopoly power.

In sum, Appellants have failed to set forth a plausible claim of attempted monopolization under Section 2 of the Sherman Act, as a matter of law.

### III. Antitrust Standing

Alternatively, Appellants' antitrust claim fails for lack of antitrust standing, which is a threshold requirement in any antitrust case. Rooted in prudential principles, antitrust standing is distinct from Article III standing, which is rooted in the Constitution. *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013).[7] While "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact," courts must also consider "whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983); *see also* Areeda & Hovenkamp, ¶ 335.

---

[7] Because antitrust standing is prudential, we are not bound to address it first, because it "does not affect the subject matter jurisdiction of the court, as Article III standing does." *Ethypharm*, 707 F.3d at 232.

Of the requirements for antitrust standing,[8] antitrust injury is "a necessary but insufficient condition," and is the only requirement in dispute here. *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997).

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, the Supreme Court rejected the notion that antitrust injury could be alleged by a private plaintiff averring that it would have fared better without the defendant's alleged conduct. 429 U.S. 477. Rather, the plaintiff must prove the existence of an antitrust injury, which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489; *see also Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours and Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) (explaining that to establish antitrust injury, "plaintiffs must prove more than harm causally linked to an illegal presence in the market"). The injury must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the

---

[8] The test for antitrust standing is: "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages." *Ethypharm*, 707 F.3d at 232–33 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993)).

violation." *W. Penn*, 627 F.3d at 101 (quoting *Brunswick*, 429 U.S. at 489).

Compensating plaintiffs injured by the effects of truly anticompetitive conduct serves the purpose of antitrust laws, namely, to foster competition. Thus, the antitrust injury requirement ensures that damages are only awarded for losses that "correspond[] to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield*, 495 U.S. at 342; Areeda & Hovenkamp, ¶ 337a. That is, there must be a causal link between the alleged injury and an antitrust violation's anticompetitive effects.

Appellants decry Uber's entry into Philadelphia as a campaign to inflict economic harm and to cause Appellants to lose their market share. They argue that all vehicles-for-hire legally operating in Philadelphia, and the riding public, have been harmed by Uber's allegedly illegal presence in Philadelphia between October of 2014 and October of 2016, when TNCs were officially permitted to operate. Appellants allege that they experienced financial harm and a reduced market share through fewer drivers, medallion cabs sitting idle, a decline in ridership, and loss of medallion value. The effect of the decrease in earnings, Appellants argue, is that taxicab companies are nearing default on their medallions and are close to being driven out of business.

Appellants allege their own injury, namely, financial hardship. Tellingly, they fail to aver an antitrust injury, such as a negative impact on consumers or to competition in general, let alone any link between this impact and the harms

21

Appellants have suffered.[9] Perhaps this is because Appellants cannot do so. According to Appellants' own pleadings, Uber's entry into the Philadelphia market, regardless of its legality, *increased* the number of vehicles-for-hire available to consumers and product differentiation in the market, thereby *increasing* competition.

The facts of *Brunswick* illustrate this point. There, a bowling equipment manufacturer acquired several failing bowling alleys that had defaulted on their equipment payments. 429 U.S. at 479–80. Three active bowling alleys brought an antitrust claim against the manufacturer, arguing that if the alleys had been allowed to fail, former patrons would have frequented plaintiffs' alleys, increasing plaintiffs' profits and market share. *Id.* at 481.

The Supreme Court held that even if the acquisition was unlawful because it provided the manufacturer with monopoly power, the plaintiffs failed to prove that there were anticompetitive effects of that acquisition in order to establish an antitrust injury. *Id.* at 487–88. Plaintiffs sought to recover lost profits from bolstered competition—the manufacturer's keeping the defaulting alleys in business. *Id.* The presence of *more* bowling alleys resulted in *more* competition, and thus the Supreme Court held that plaintiffs had not sustained an antitrust injury. *Id.* at 489.[10]

---

[9] Appellants allege the potential detriment to consumers in the event that medallion taxicabs are driven out of the market, entirely. *See, e.g.*, SAC ¶ 62. Yet they fail to aver any facts suggesting that this is an imminent, realistic possibility.

[10] *See also* Areeda & Hovenkamp, ¶ 337 ("At its most fundamental level, the antitrust injury requirement precludes

22

Similarly here, Appellants urge the application of antitrust laws for the express *opposite* purpose of antitrust laws: to compensate for their loss of profits due to increased competition from Uber. However, harm to Appellants' business does not equal harm to competition. "Conduct that merely harms competitors, . . . while not harming the competitive process itself, is not anticompetitive." *Broadcom*, 501 F.3d at 308. Were we to award Appellants antitrust damages to compensate for their financial injuries, we would condemn vigorous competition, rather than encourage it. *See Travelers Ins. Co. v. Blue Cross of W. Pa.*, 481 F.2d 80, 84 (3d Cir. 1973).

Without demonstrating a harmful effect on price, such as predatory or monopoly pricing, Appellants instead argue that Uber's ability to operate at a lower cost caused Appellants economic harm and caused Appellants to lose their market share. But Appellants never argue that the lower cost—evidence of *increased* competition—failed to result in lower prices for consumers. "A plaintiff who wants . . . less competition or higher prices, that would injure consumers, does not suffer antitrust injury." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003).

Nor do Appellants aver a negative effect on the availability of taxicab services. Appellants themselves admit that Uber's 1700 vehicles took over 700,000 riders on more than one million trips in its first two years in Philadelphia, while the number of medallion cabs allegedly decreased by at

___

any recovery for losses resulting from competition, even though [in *Brunswick*] such competition was actually caused by conduct violating the antitrust laws.").

least 15 percent, or roughly 240 vehicles, from its peak of 1610. Thus, the SAC alleges an increase in the availability of vehicles-for-hire for Philadelphia passengers.

Appellants also insist that Uber's alleged illegal presence in Philadelphia caused an antitrust violation.[11] They attempt to circumvent the antitrust injury requirement by focusing on how Uber's purportedly illegal operation enabled it to cut costs and increase its market share. But again, the Supreme Court has squarely rejected illegal conduct as a basis for antitrust injury. A competitor's illegal presence in a market is not a *per se* antitrust violation, and any resulting injury is alone insufficient for a private plaintiff to state an antitrust injury. *Atl. Richfield*, 495 U.S. at 334 (quoting *Brunswick,* 429 U.S. at 489).

Finally, Appellants do not cite any case in support of the contention that Uber's violation of state regulations, even if that gave Uber a competitive advantage, renders its operation in violation of antitrust laws. Even if we were to find Uber's operation in Philadelphia unlawful in its first two years, we would do so under PPA regulations, and not under antitrust laws. Ultimately, Uber's presence in the market, as alleged, created *more* competition for medallion taxicabs, not *less*, and thus Uber's so-called "predation"—operating without medallions or certificates of public convenience—does not give rise to an antitrust injury.

---

[11] "The antitrust injury in this case is the anticompetitive effect made possible by the violation of the laws and regulations in place at the time." SAC ¶ 75.

24

In sum, we affirm the dismissal of the SAC for the additional reason that it fails to assert an antitrust injury.

## IV. Associational Standing

To have associational standing, the PTA must meet three requirements: "(1) the organization's members must have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires individual participation by its members." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014) (quoting *Pa. Prison Soc. v. Cortes*, 508 F.3d 156, 163 n.10 (3d Cir. 2007)).

The District Court concluded that the PTA failed the first requirement of associational standing that the Supreme Court articulated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because the Individual Plaintiffs lack standing to sue on their own in light of their failure to aver an antitrust injury.

However, as we discussed in Section III, *supra*, Article III standing is a constitutional requirement, separate from antitrust standing, and Article III standing could be satisfied if a plaintiff presents a "case or controversy." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–55 (1996).

Here, the Individual Plaintiffs do have Article III standing by virtue of their alleged competitive injury in the taxicab market, such that the PTA satisfies the first requirement, and could plausibly meet the other two requirements, for associational standing. However, even if the

25

PTA has *associational* standing, they do not have *antitrust* standing in order to maintain an antitrust cause of action.

## V. Conclusion

Appellants may have been better off, financially, if Uber had not entered the Philadelphia taxicab market. However, Appellants have no right to exclude competitors from the taxicab market, even if those new entrants failed to obtain medallions or certificates of public convenience. *See Ill. Transp. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 597 (7th Cir. 2016) (Posner, J.), *cert. denied sub nom. Ill. Transp. Trade Ass'n v. City of Chicago, Ill.*, 137 S. Ct. 1829 (2017).

If medallion taxicabs could prevent TNCs from entering the Philadelphia market, and if incumbents could prevent new entrants or new technologies from competing because they fear loss of profits, then "economic progress might grind to a halt." *Id.* at 596–97. "Instead of taxis we might have horse and buggies; instead of the telephone, the telegraph; instead of computers, slide rules." *Id.* at 597.

Absent any allegations of anticompetitive conduct, Appellants fail to allege any of the elements for a claim for attempted monopolization under Section 2 of the Sherman Act and fail to allege antitrust standing.

For the foregoing reasons, the judgment of the District Court is AFFIRMED.