NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 18-2212

———————

SUZAN MCGARY, M.D.,
                                                    Appellant

v.

WILLIAMSPORT REGIONAL MEDICAL CENTER;
SUSQUEHANNA HEALTH SYSTEM; GEORGE MANCHESTER, M.D.;
SCOTT CROLL, M.D.; JOHN BURKS, M.D.; MARK A. OSEVALA, D.O.

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4-12-cv-1742)
District Judge:  Hon. Matthew W. Brann

———————

Submitted Under Third Circuit LAR 34.1(a)
January 22, 2019

Before:  JORDAN, KRAUSE, and ROTH, *Circuit Judges.*

(Filed:  June 6, 2019)

———————

OPINION*

———————

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P.
5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Susan McGary appeals the grant of summary judgment for Susquehanna Health System ("Susquehanna Health"), its wholly owned subsidiary Williamsport Regional Medical Center (the "Medical Center" or the "hospital"), and related employees Dr. George Manchester, Dr. Scott Croll, Dr. John Burks,[1] and Dr. Mark Osevala[2] (collectively, the "Defendants") on her antitrust and related state law claims. We will affirm.

## I. BACKGROUND

Dr. McGary is a board-certified cardiothoracic ("CT") surgeon. For nearly a decade, she practiced CT surgery at the Medical Center. She left in 2007 but, four years later, decided she wanted to return and sought employment there again. The Medical Center, however, did not offer her a position because, it explained, it did not have enough work to support another CT surgeon in addition to Dr. Osevala, the sole CT surgeon on staff.

Dr. McGary decided to open her own private practice instead, but she still needed access to the Medical Center's facilities to perform surgery. As an "open staff" facility, the hospital allows private practitioners to apply for staff privileges. (App. at 1182-83.) Dr. McGary did so in January 2012. At the time she applied, the Medical Center had

---

[1] The spelling of Dr. Burks's last name is inconsistent in the record, but we use "Burks" to be consistent with the parties' filings.

[2] Drs. Croll, Burks, and Osevala are employed by non-party Susquehanna Physicians Services, a wholly owned subsidiary of Susquehanna Health. Dr. Manchester is employed by Susquehanna Health.

credentialing criteria that required applicants for CT surgery privileges to have performed at least 100 heart surgeries and 100 lung surgeries within the previous year (the "100/100 criteria"). Those credentialing criteria were actually established while Dr. McGary was one of two "leaders" of the hospital's CT surgery program.[3] (App. at 849 ¶¶ 19-20.) When applying for staff privileges in 2012, however, Dr. McGary did not have the recent experience required by the 100/100 criteria.

Susquehanna Health's Medical Bylaws set forth procedures for processing applications, including escalating levels of review.[4] Dr. Manchester, the hospital's Chief

---

[3] While Dr. McGary contends that she played no role in their adoption, the Defendants assert that she was involved in setting the criteria.

[4] The Medical Staff Bylaws provide:

> The completed application form shall be submitted to the Medical Director's Office along with any application fee. Upon receipt of the application, the Medical Director shall notify the CEO of Susquehanna Health and the President of the Medical Staff. A summary of the application information shall be transmitted to the Credentials Committee and the Chairman of each department in which the applicant seeks clinical privileges.

(App. at 153 ¶ 5.2-1.)

According to the Bylaws, the Department Chairman then reviews the applicant's information, may interview the applicant, and transmits a written report within thirty days to the Credentials Committee with the Chairman's recommendations and reasoning for such recommendations. Within sixty days of receiving the Department Chairman's report, the Credentials Committee is required to submit a written report containing its recommendations and rationales to the Medical Executive Committee. Within sixty days of receiving that report, that Committee is required to make its appointment recommendation. If the Medical Executive Committee recommendation is unfavorable, the Bylaws provide for appeal rights and a hearing.

3

Medical Officer, reviewed Dr. McGary's application but quickly realized she did not meet the 100/100 criteria. After discussing her application with Dr. Croll, who is the Chairman of the Medical Center's Surgery Department, and with Dr. Burks, the Director of the Heart and Vascular Institute at the hospital, Dr. Manchester deemed her application incomplete and did not pass it along for further review. Dr. Manchester informed Dr. McGary that she did not satisfy the Medical Center's credentialing criteria and that her application would not be submitted for further review.

When Dr. McGary learned that her application had been denied, she suggested to Dr. Manchester that the 100/100 criteria were too stringent and that the Medical Center should be satisfied with her record as it stood. At Dr. Manchester's request, she researched CT surgery credentialing criteria at other hospitals in the area. That research prompted the hospital to revise its criteria. Nonetheless, believing she was still ineligible, Dr. McGary did not reapply. Instead, she opened a private outpatient vein surgery practice and filed this lawsuit.

In her six-count amended complaint, she alleges violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and the equal protection and due process clauses of the Constitution. She also asserts state law claims for breach of contract, interference with prospective contractual relationships, and conspiracy in restraint of trade.

The District Court dismissed Dr. McGary's due process and equal protection claims, leaving her to proceed on her antitrust and state law claims.[5] Following discovery, the Defendants moved for summary judgment on all remaining claims. The District Court granted that motion. Dr. McGary has timely appealed.

## II. DISCUSSION[6]

Dr. McGary asserts that the District Court erred in granting summary judgment in favor of the Defendants on her claim for unlawful combination or conspiracy in restraint of trade under Section 1 of the Sherman Act, her claims for monopolization and attempted monopolization under Section 2 of the Sherman Act, and her state law claims for breach of contract, interference with prospective contractual relationships, and

---

[5] The due process and equal protection claims are not before us on this appeal. Neither is her claim for injunctive relief, which was also dismissed.

[6] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo and "view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party." *Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010) (citation omitted). "Summary judgment is appropriate where the [c]ourt is satisfied 'that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citation omitted). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

conspiracy in restraint of trade. Despite the doctor's disappointment, the District Court was correct.

### A.      Claim Under Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 1. To prevail on a claim under Section 1, "a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that [she] was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 206-07 (3d Cir. 2005).

The District Court granted summary judgment on Dr. McGary's Section 1 claim because it concluded that the Defendants were, as a matter of law, a single entity and thus were incapable of concerted action. Dr. McGary challenges that conclusion. She argues that Dr. Osevala had personal economic interests in excluding her from practicing at the Medical Center—namely, an incentive bonus[7] and his fear of losing his job—that were separate and apart from the "institutional" Defendants' "economic interest" in excluding her. (Opening Br. at 25.)

"Unilateral action, no matter what its motivation, cannot violate [Section] 1." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3d Cir. 1996) (citation omitted). Concerted action requires two or more distinct entities to agree to take action. *Weiss v.*

---

[7] Dr. Osevala's employment agreement includes an "Incentive Compensation" clause (App. at 253 ¶ 6) that gives him a percentage of receipts above expenses.

6

*York Hosp.*, 745 F.2d 786, 813 (3d Cir. 1984). Hence, a parent company is incapable of conspiring with its wholly owned subsidiary in violation of Section 1. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (explaining that those entities "have a complete unity of interest"). The same is true, in the typical case, of a company and its officers and employees. *Id.* at 769.

There are, however, exceptions to that general rule. For example, where "a single entity [is] made up of independent, competing economic entities"—as is true at a hospital with medical professionals who are in competition with one another—those individuals constitute independent actors capable of agreement with one another in violation of Section 1. *Weiss*, 745 F.2d at 816. In addition, if "employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employer[.]" *Id.* at 813 n.43.

The question, then, is whether any combination of the Defendants in this case is capable of concerted action. Dr. McGary could try to satisfy that requirement in one of several ways: by alleging concerted action between the "institutional" entities, Susquehanna Health and the Medical Center; between two or more of the individual doctor Defendants; or between Susquehanna Health and/or the Medical Center and one or more of the individual doctor Defendants. Each of those potential combinations, however, fails to provide the doctor with the foothold she seeks.

Here, Susquehanna Health is incapable of concerted action with the Medical Center because the Medical Center is a wholly-owned subsidiary of Susquehanna Health. *Copperweld*, 467 U.S. at 771. There is also no evidence that the individual doctor

7

Defendants were in competition with one another or would be in competition with Dr. McGary, except Dr. Osevala. Indeed, all of the evidence indicates that, apart from Dr. Osevala, the doctor Defendants, none of whom practice CT surgery, would be unaffected by Dr. McGary's practice.

That leaves Dr. McGary with her claim that Dr. Osevala was motivated by his own personal economic interest and thus is capable of concerted action with the Medical Center or Susquehanna Health. The evidence Dr. McGary advances is simply that Dr. Osevala made a recommendation to Dr. Manchester that the Medical Center was too small to support two CT surgeons. But in order to prove concerted action between a hospital and its staff, "there must be something . . . such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation." *Mathews*, 87 F.3d at 639-40 (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991), *cert. denied*, 502 U.S. 1074 (1992)). A mere recommendation does not prove concerted action. *Id.* Accordingly, there is insufficient evidence to raise a genuine dispute of material fact as to whether Dr. Osevala coerced the Medical Center or Susquehanna Health to deny Dr. McGary surgical privileges. We will therefore affirm the grant of summary judgment to the Defendants on the Section 1 claim.

### B. Claims Under Section 2 of the Sherman Act

Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007). We address in turn McGary's three claims under Section 2.

8

### 1. *Monopolization Claim*

To prevail on a monopolization claim, a plaintiff must prove: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 306-07. The District Court rejected Dr. McGary's argument that the Defendants' use of the 100/100 criteria proved they had acted to willfully maintain their monopoly because it found that "at least seven doctors met the [100/100] criteria and, consequently, gained surgical privileges[.]" (App. at 10-11.) Dr. McGary contends that the District Court's reasoning was flawed because six of those doctors were *locum tenens* physicians who had met lower criteria to be granted privileges.[8] She also argues the Defendants acted anticompetitively by failing to process her application in the manner set forth in the hospital's Bylaws.

Dr. McGary's monopolization claim is precluded by *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir. 1984). In *Weiss*, the plaintiff argued that a hospital's denial of his application for privileges proved the hospital had willfully acquired or maintained

---

[8] A *locum tenes* physician is one who temporarily fulfills the obligations of another physician. *See Locum tenens*, Black's Law Dictionary (10th ed. 2014) ("A deputy; a substitute; a representative."). Under the Bylaws, an applicant for *locum tenens* privileges must provide documentation of her licensure, training, and professional references, among other items, but there does not appear to be any minimum requirement for number of surgical procedures performed. The dispute over other doctors' qualifications is irrelevant because we affirm the District Court's ruling on other grounds. *See Hughes v. Long*, 242 F.3d 121, 122 n.1 (3d Cir. 2001) ("We may affirm a District Court's judgment on grounds other than those considered by the District Court itself.").

9

monopoly power. *Id.* at 828. We held, however, that the hospital in question, "like any hospital, would maximize its revenues by giving staff privileges to every qualified doctor who applied." *Id.* By failing to demonstrate what economic motive the hospital would have for denying the plaintiff's application, the plaintiff had failed to prove that the hospital acted "willfully" to maintain its monopoly power. *Id.*

So too here. Dr. McGary has failed to explain, or produce any evidence supporting, an economic motive that the Medical Center—the entity that she alleges has monopoly power—would have to deny a qualified surgeon any practice privileges. Lacking that evidence, her monopolization claim fails. *Id.* Further, to the extent Dr. McGary contends that Dr. Osevala had an anticompetitive motive for his action, his motive cannot be imputed to the Medical Center. *Id.* On the contrary, there is no reason to believe that rejecting qualified practitioners—particularly those capable of offering more sophisticated surgical techniques than current practitioners, as Dr. McGary claims she can—would aid the hospital in maintaining monopoly power. *Id.* Accordingly, we agree with the District Court that Dr. McGary's monopolization claim fails.

### 2. Attempted Monopolization Claim

To prove attempted monopolization, a plaintiff must prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom Corp.*, 501 F.3d at 317 (citation omitted). The District Court determined that Dr. McGary's attempted monopolization claim failed because she could not show that the

10

Defendants had a specific intent to monopolize. Dr. McGary challenges that conclusion, arguing that the Defendants' use of the 100/100 criteria and failure to follow the credentialing process in the Bylaws demonstrates their specific intent to monopolize.

"[I]n a traditional § 2 claim, a plaintiff would have to point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize. Some courts have inferred specific intent from anticompetitive or exclusionary conduct, for instance, when business conduct is not related to any apparent efficiency." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 341 (3d Cir.), *cert. denied*, 139 S. Ct. 211 (2018) (citations and quotation marks omitted).

Dr. McGary alleges no such egregious behavior. Moreover, as noted above, she has failed to explain what economic motive the hospital would have to use the credentialing process to exclude qualified surgeons—a move that would hurt, not help, it acquire or maintain a monopoly. We fail to see how those actions can demonstrate an intent to monopolize. Accordingly, we will affirm the order of the District Court as to Dr. McGary's attempted monopolization claim under Section 2.

### 3. Conspiracy to Monopolize

Like claims under Section 1 of the Sherman Act, "[c]laims for conspiracy to monopolize under Section 2 of the Sherman Act also require evidence of a conspiracy" between two or more distinct entities. *Gordon*, 423 F.3d at 207 & n.16. For the reasons already discussed, the Defendants are incapable of conspiracy in violation of antitrust laws. We will thus affirm the grant of summary judgment to the Defendants on Dr. McGary's claim for conspiracy to monopolize.

11

C.     **State Law Claims**

Dr. McGary also challenges the District Court's grant of summary judgment on her state law claims for breach of contract, intentional interference with prospective contractual relations, and civil conspiracy in restraint of trade.

*1.     Breach of Contract Claim*

The contract claim is premised on Susquehanna Health's Medical Staff Bylaws. Dr. McGary argues that Dr. Manchester breached her contractual right to have her application processed in the manner set forth in the Bylaws.  In other words, she presses a third-party beneficiary theory.[9]

Under Pennsylvania law,

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *unless*, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti v. Weborg*, 609 A.2d 147, 150-51 (Pa. 1992).

Dr. McGary relies on the preamble and Article V of the Bylaws to establish what she contends are her third-party beneficiary rights.  The preamble states that the Bylaws "create a system of mutual rights and obligations among the Hospital(s), members, and

---

[9] In Pennsylvania, "[t]he staff bylaws of a hospital constitute the terms of a legally binding contract between the hospital and the doctors on its staff." *Miller v. Ind. Hosp.*, 419 A.2d 1191, 1193 (Pa. Super. Ct. 1980).  Dr. McGary, however, did not have staff privileges at the Medical Center.  Thus, despite the fact that she argues—once, and only in passing—that by submitting her application she became a party to the agreement, her claim proceeds under a third-party beneficiary theory.

other practitioners." (App. at 1446.) She argues that the phrase "other practitioners" is clearly intended to refer to applicants for surgical privileges. Article V governs appointment to the hospital's medical staff and sets forth the requirements for applicants and the procedures for processing applications. Dr. McGary notes that applicants agree to be bound by the Bylaws and that unsuccessful applicants are granted hearing and appeal rights.

She has not, however, directed us to any "Pennsylvania decision [that] has recognized an applicant for staff privileges as a third-party beneficiary of the medical staff bylaws of a private hospital." *Robinson v. Magovern*, 521 F. Supp. 842, 926 (W.D. Pa. 1981), *aff'd*, 688 F.2d 824 (3d Cir. 1982). The language of the Bylaws does not prompt a different understanding, nor do the circumstances compel the conclusion that Dr. McGary is a third-party beneficiary of the Bylaws. She simply did not meet the standard for surgical privileges.[10] *Cf. Petrocco v. Dover Gen. Hosp. & Med. Ctr.*, 642

---

[10] Moreover, even if Dr. McGary were to be considered a third-party beneficiary of the Bylaws, her claim still fails, as it does not appear that there was any breach of the Bylaws. Under the Bylaws, the first step of the application processing procedure calls for "[t]he Credentials Committee, with assistance from the Medical Director's office, . . . to verify information on the application[] and collect any additional information necessary to evaluate the application." (App. at 1463 ¶ 5.2-5(a).) Only once the "verification and collection of additional necessary information is accomplished," is the application passed on to "the Credentials Committee and the Chairman of each department in which the applicant seeks clinical privileges." (App. at 1463 ¶ 5.2-5(a).) The Bylaws make clear that the applicant bears "the burden of producing adequate information for a proper evaluation of [her] qualifications, of resolving any reasonable doubts about [her] qualifications, and of satisfying requests for information." (App. at 1462 ¶ 5.2-4.) Dr. Manchester, consistent with his obligations under the Bylaws, "reviewed [her] application for completeness" and notified Dr. McGary of (multiple) issues with her application, including her failure to satisfy the 100/100 criteria. (App. at 351.) She was given ample opportunity to rectify those problems. But she failed to supply the records

A.2d 1016, 1022 (N.J. Super. Ct. App. Div. 1994), *cert. denied*, 649 A.2d 1284 (N.J. 1994) (table) (comparing a third-party beneficiary claim based on the plaintiff's claimed "contractual right to have his application processed under the bylaws, including the provisions for a hearing" to *Robinson* and concluding that the "Plaintiff in this case was not eligible for staff membership under the bylaws as written. Hence we will not infer that the bylaws were intended to protect plaintiff as a third-party beneficiary"). Accordingly, her claim fails.

### 2. *Intentional Interference with Prospective Contractual Relations*

To prove intentional interference with contractual relations, Dr. McGary must prove "(1) a prospective contractual relationship; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Phillips v. Selig*, 959 A.2d 420, 428 (Pa. Super. Ct. 2008). The Pennsylvania Supreme Court has explained that "where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated." *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971) (citation omitted).

---

needed to verify that she met the required credentialing criteria because those records did not exist. While Dr. McGary complains that her application was not passed on for further review, it is not clear that she was entitled to any more review than she received. *See Miller*, 419 A.2d at 1194 ("Such de minimis deviations from the provisions of the hospital bylaws are not the sort of impermissible breach contemplated by the [Pennsylvania Supreme] Court … when it established the requirement of strict compliance with staff bylaws.").

14

In drawing that line, the focus is on whether the defendant's conduct is "sanctioned by the 'rules of the game.'" *Id.* (citation omitted).

The District Court concluded that Dr. McGary had failed to show that the Defendants acted with the specific intent to harm her. Dr. McGary argues, however, that the Defendants "had to know that by denying [her] privileges" at the hospital she would be prevented from competing in the market. (Opening Br. at 46.) That, along with the hospital's concern that Dr. Osevala would not have enough cases and its "bypass[ing]" the Bylaws's application procedures, evidences their specific intent to cause her harm. (Opening Br. at 47.) We disagree.

As the District Court explained, the Defendants' denial of Dr. McGary's application shows, at most, that the "Defendants acted with an intent to improve their own business"—by not granting privileges to a physician who did not meet their credentialing criteria, which they had long before set to ensure quality of patient care, not to intentionally harm Dr. McGary. (App. at 13-14.) Further, the record shows that, when Dr. McGary objected to the criteria as too stringent, Dr. Manchester was sympathetic and asked her to research "appropriate numbers and . . . literature" so that the Medical Center might revise its criteria. (App. at 350-51.) The hospital then did so.

In short, the Defendants had legitimate interests of their own that they were entitled to look to, and there is no evidence that they adopted or applied the credentialing criteria to prevent Dr. McGary from practicing at the Medical Center. *Cf. Phillips*, 959 A.2d at 429-30 (listing, as a factor to be considered in determining whether the defendant acted with justification, a factor closely related to intent, "the proximity or remoteness of

15

the actor's conduct to the interference" (quoting Restatement (Second) of Torts § 767 (Am. Law Inst. 1979)).  Thus, the intentional interference with prospective contractual relations claim fails.

### 3. Civil Conspiracy in Restraint of Trade

Under Pennsylvania law, a claim for civil conspiracy requires proof "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.  Proof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy.  This unlawful intent must be absent justification." *Thompson Coal*, 412 A.2d at 472 (citations omitted).

The District Court granted summary judgment to the Defendants based on its conclusion that they were legally incapable of conspiracy.  Dr. McGary once again argues that Dr. Osevala had his own distinct interest in excluding her from practicing at the Medical Center, an interest separate from the other Defendants' interests, making a conspiracy possible.  That argument is still wanting.

Under Pennsylvania law, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Grose v. Procter & Gamble Paper Prods.*, 866 A.2d 437, 441 (Pa. Super Ct. 2005) (alteration in original) (quoting *Thompson Coal*, 412 A.2d at 472); *see also Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa. Super. Ct. 1992) (explaining that employees and a corporation are "one and the same" when employees "act within the scope of their employment").  Dr. McGary does not argue that any of the individual Defendants acted

16

outside the scope of their employment in denying her application for privileges.[11]

Moreover, for the reasons discussed above, there is no evidence that Dr. Osevala and the Medical Center or Susquehanna Health agreed to deny her application with an intent to injure her. That conclusion is fatal to her civil conspiracy claim. *Rutherfoord*, 612 A.2d at 508. Thus, we will affirm the grant of summary judgment on that claim too.

## III. CONCLUSION

For the foregoing reasons, we will affirm the order of the District Court.

---

[11] Pennsylvania has rejected a *per se* rule that parent companies are incapable of conspiring with their subsidiaries for purposes of a civil conspiracy claim. *Shared Commc'ns Servs. of 1800-80 JFK Blvd. Inc. v. Bell Atl. Props. Inc.*, 692 A.2d 570, 573-74 (Pa. Super. Ct. 1997). But, while the Medical Center and Susquehanna Health may be capable of conspiring with one another under Pennsylvania law, Dr. McGary has presented no evidence, and does not argue, that the Medical Center and Susquehanna Health conspired with one another. As a result, any claim to that effect has been forfeited. *See Metro. Edison Co. v. Pa. Pub. Util. Co.*, 767 F.3d 335, 352 (3d Cir. 2014).